## APPEAL OF ILLINOIS TERMINAL CO. (FORMERLY ILLINOIS TERMINAL RAILROAD CO.)

Docket No. 2763.   Decided October 4, 1926.

COMPENSATION OF RAILROAD COMPANY DURING PERIOD OF FEDERAL CONTROL.—The reasonable compensation of a railroad company, for the use of its properties during ·the period of Federal control, awarded to a taxpayer keeping its accounts on the accrual basis, was income for each of the accounting periods for which the compensation was allowed, although not received until a later date.

*E. F. Wetteroth, C. P. A.*, for the petitioner.
*P. S. Crewe, Esq.*, for the Commissioner.

This is an appeal from the determination of deficiencies in income and profits tax for the years 1918, 1919 and 1920, in the amount of $65,878.19. The question involved is whether money paid by the United States to the taxpayer, in the year 1922, for the use of the taxpayer's property during the period January 1, 1918, to March 1, 1920, was income for that period or for the year in which it was paid. The appeal was submitted on the pleadings and stipulations by the parties.

FINDINGS OF FACT.

The taxpayer is an Illinois corporation with its principal place of business at Elton.

During the period of Federal control of carriers, which extended from January 1, 1918, to March 1, 1920, the Government took charge of the taxpayer's property. No agreement was entered into between the taxpayer and the Government with respect to the compensation the taxpayer was to receive for the use of its property during the period of Federal control. No compensation was actually received by the taxpayer from the Government until more than two years after the close of the Federal control period, and no compensation was entered by the taxpayer upon its books during that period. The taxpayer kept its books on the accrual basis.

After the close of the period of Federal control, the taxpayer filed a claim with the United States Railroad Administration for compensation for the use of its property by the Government during the period of Federal control, and in September, 1922, it was awarded compensation therefor in the amount of $390,818.05.

The taxpayer included in its income-tax return for the year 1922 the amount of $390,818.05, received in that year from the Government for the use of its property during the period of Federal control, and paid a tax thereon of $48,852.26. The amount of $390,818.05 so included in its return for the year 1922 represents income for two years and two months on the basis of a " standard return " of $180,377.56 per year.

The Commissioner prorated the $390,818.05 referred to to the years 1918, 1919 and 1920, and determined that there are additional taxes due for those years as follows:

| | |
|---|---|
| 1918 | $35,119.24 |
| 1919 | 28,970.43 |
| 1920 | 1,788.52 |
| Total | 65,878.19 |

OPINION.

TRUSSELL: The taxpayer is a corporation owning certain railroad properties which it had operated for a number of years prior to

1918. Between January 1, 1918, and March 1, 1920, these properties were in the possession and use of the United States. During all the times here considered it has had the established practice of keeping its books in accordance with the methods of accrual accounting, and has made reports on that basis to the Interstate Commerce Commission and income and profits tax returns under the several revenue acts. The issue here presented is, What was this taxpayer's income and liability to income and profits taxes during the calendar years 1918, 1919 and 1920?

As of the date of January 1, 1918, the Government of the United States took over "the possession, use, control, and operation" of the taxpayer's property and retained such possession, use, and operation until March 1, 1920, when the said property was restored to the possession, use, and control of the taxpayer. The period from January 1, 1918, to February 28, 1920, has been designated as the period of Federal control, and during that time "the Government operated [the taxpayer's property] not as lessee, but under a right in the nature of eminent domain." *North Carolina R. R. Co.* v. *Lee*, 260 U. S. 16; *Missouri Pacific R. R. Co.* v. *Ault*, 256 U. S. 554. The Government having thus exercised its right of taking the use and operation of this taxpayer's property and appropriating the same to the public uses, such act immediately set in motion the guarantee contained in the Fifth Amendment of the Constitution which provides:

Nor shall private property be taken for public use, without just compensation.

Immediately upon the taking over by this exercise of the right of eminent domain, Congress, on March 21, 1918, enacted the Federal Control Act, 40 Stat. 451, defining the position of the United States in relation to the "possession, use, control, and operation" of the railroad systems and providing for the immediate adjustment and payment of the just compensation required by the Constitution. The relevant portions of said Act are as follows:

Sec. 1. * * * That the President, having in time of war taken over the possession, use, control, and operation (called herein Federal control) of certain railroads and systems of transportation (called herein carriers), is hereby authorized to agree with and to guarantee to any such carrier making operating returns to the Interstate Commerce Commission, that during the period of such Federal control it shall receive *as just compensation an annual sum, payable from time to time in reasonable installments, for each year and pro rata for any fractional year* of such Federal control, not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June thirtieth, nineteen hundred and seventeen.

\*          \*          \*          \*          \*          \*          \*

Every such agreement shall provide that any Federal taxes under the Act of October third, nineteen hundred and seventeen, or Acts in addition thereto or in amendment thereof, commonly called war taxes, assessed for the period of

Federal control beginning January first, nineteen hundred and eighteen, or any part of such period, shall be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation; * * *.

*       *       *       *       *       *       *

Sec. 2. That if no such agreement is made, or pending the execution of an agreement, the President may nevertheless pay to any carrier while under Federal control an *annual amount*, payable in reasonable installments, not exceeding ninety per centum of the estimated annual amount of just compensation, remitting such carrier, in case where no agreement is made, to its legal rights for any balance claimed to the remedies provided in section three hereof. Any amount thereafter found due such carrier above the amount paid shall bear interest at the rate of six per centum per annum. The acceptance of any benefits under this section shall constitute an acceptance by the carrier of all the provisions of this Act and shall obligate the carrier to pay to the United States, with interest at the rate of six per centum per annum from a date or dates fixed in proceedings under section three, the amount by which the sums received under this section exceed the sum found due in such proceedings.

Sec. 3. That all claims for just compensation not adjusted (as provided in section one) shall, on the application of the President or of any carrier, be submitted to boards, each consisting of three referees to be appointed by the Interstate Commerce Commission, * * *. Said boards shall give full hearings to such carriers and to the United States; shall consider all the facts and circumstances, and shall report as soon as practicable in each case to the President *the just compensation, calculated on an annual basis* and otherwise in such form as to be convenient and available for the making of such agreement as is authorized in section one. * * *

*       *       *       *       *       *       *

Sec. 14. That the Federal control of railroads and transportation systems herein and heretofore provided for shall continue for and during the period of the war and for a reasonable time thereafter, which shall not exceed one year and nine months next following the date of the proclamation by the President of the exchange of ratifications of the treaty of peace * * *.

*       *       *       *       *       *       *

Sec. 16. That this Act is expressly declared to be emergency legislation enacted to meet conditions growing out of war * * *. (Italics ours.)

By this Act, Congress provided both the methods of ascertainment and the time and manner of payment to this taxpayer of the just compensation guaranteed to it by the Constitution. In respect to this Act the report of the Senate Committee on Interstate Commerce stated that the Act would—

Determine finally and completely all rights as between the Government and the owners [of the transportation systems], thus avoiding the delays incident to litigation and giving strength and stability to the security market and *rendering assistance* to our future war financing. (Italics ours.)

The same Senate Committee report also contains the following:

Section 1 further provides that ordinary taxes, National and State, shall as now, be paid out of operating revenue; *but war taxes accruing under the Act of October 3, 1917, are to be paid by the companies out of their own funds or charged against the standard return. In other words, the holders of railroad*

*securities are by section 1 (like holders of other securities) to bear their own just portion of the war burden * * *.*

The standard return thus provided for will, if accepted by the various operating companies, be disposed of substantially as hitherto; that is, for the payment of their fixed charges (*and war taxes which remain a burden upon the standard return*), for dividends, and if any balance remains for so-called surplus. (Italics ours.)

Respecting the same Act, the report of the House Committee on Interstate and Foreign Commerce, recommending H. R. 9685, which carried the general plan of the statute as finally enacted, said:

Section 1 is a fundamentally important section; for it sets the outside limits of the expected agreements. Its sole function is to provide a basis of such just and proper agreements as may eliminate litigation. This section authorizes the President to make agreements with the operating carriers under which they shall receive in lieu of their constitutional rights the average of their railway operating income for the three years ended June 30, 1917, plus an additional income at some reasonable rate to be fixed by the President upon the cost of additions to their property made during the last six months of 1917. This additional return is allowed for the sake of equality, as it is stated that a comparatively few of the carriers have during this six months period invested more than $200,000,000 in property now applied to public use. Ordinary taxes, Federal and State, are to be paid as hitherto out of operating income. *But war taxes are (in effect) payable out of the standard return; the owners of railroad securities, like the owners of other securities, are thus left to carry their share of the war tax burden.* (Italics ours.)

The Federal Control Act, some of the provisions of which are shown above, clearly sets forth and defines the situation created by the taking over of the transportation systems, and the relations between the Government and the owners of such systems and the provisions of that Act have been universally accepted, both by the carrier corporations and by the courts and the people of the United States, as finally determining and settling all the problems growing out of the situation created when the President, in the exercise of his war authority, took over the transportation systems of the country.

In unmistakable language the said Act determined that the Government took over and appropriated to the public use, not the properties of the carrier companies, but only " the possession, use, control, and operation " of such properties. And in section 14 of the Act it is specifically stated that such possession and operation was taken only for a limited period, and the just compensation required by the Constitution was fixed upon a definite *annual* basis. Having under consideration a somewhat analogous situation, the Court of Claims, in *Johnson v. United States* (1866), 2 Ct. Cls. 391, said:

The measure of the damages [for the temporary occupation of lands by the government] must be limited to the value of this temporary occupancy [at the time of entry], as though the claimant had leased and the government had rented the premises regard being paid to the nature of the occupancy and to

the fact that the government had the option of discounting the implied tenancy on any day or of retaining it indefinitely.

It thus appears that while, during the possession and control of property taken by virtue of the exercise of the right of eminent domain, and for a temporary period, the Government does not occupy the position of a lessee, the just compensation required by the Constitution is in effect in the nature of rent and may be properly measured by the value of the use and operation of such properties at the time of the entry; and, therefore, Congress enacted that the just compensation should, in the absence of special circumstances or conditions, be measured by the amount of the net average operating income accruing to the carrier corporations during the three annual accounting periods last preceding the taking over of control and operation by the Government, and that such just compensation should be paid to the carrier corporations " in reasonable installments, for each year and *pro rata* for any fractional year " during which Federal control might continue.   The language of the Act is too explicit to permit of any doubt that the just compensation provided for was intended to be and was income to the carrier corporations annually during the period of Federal control.

While the Federal Control Act can not be interpreted in any sense as a revenue or taxing statute, it is obvious throughout the entire body of the Act that Congress had constantly in mind the effect which Federal operation of the transportation systems might have upon the revenues of the United States and did not for a moment overlook the urgent necessity of the Government for the raising of extraordinary revenue by the means of income and profits taxes already levied, or which might thereafter be levied, to meet the necessities of the Government during the period of the then existing war; and in the framing of the Federal Control Act Congress undertook to, and in our opinion successfully did, make such provisions that the carrier corporations should, out of their gains and profits, including just compensation for the use of their properties, contribute to the revenues of the Government their just proportionate share of the extraordinary tax levies, and that such contributions from the carrier corporations should be made as of the same periods of time during which other taxpayers were carrying the burden of excess-profits and war-profits taxation.

During the entire period of Federal control of the transportation systems the Revenue Act of 1918 was in force and effect, and section 212 (b) of that Act provided that:

The net income [of all taxpayers] shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * * or if the method employed

does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income.

This taxpayer kept its books upon what is known as the accrual system of accounting, and, while there may not be any fixed and unchangeable rules of accounting methods, it has become the settled practice of accrual accounting that all items of gross income, as well as all items of deductible expense and loss, shall be set up in the accounting system as accrued income, whether received or not, or as expenses and losses, whether paid or not. In the recent case of *United States* v. *Anderson*, 269 U. S. 422, where there was under consideration the subject of the accrual of operating expenses, including deductible taxes, Mr. Justice Stone, speaking for the court and referring to section 13(d) of the Revenue Act of 1916, which provided for the making of income-tax returns in accordance with the taxpayer's method of accounting, said (p. 440):

A consideration of the difficulties involved in the preparation of an income account on a strict basis of receipts and disbursements for a business of any complexity, which had been experienced in the application of the Acts of 1909 and 1913 and which made it necessary to authorize, by departmental regulation, a method of preparing returns not in terms provided for by those statutes, indicates with no uncertainty the purpose of §§ 12 (a) and 13 (d) of the Act of 1916. It was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; and indeed, to require the tax return to be made on that basis, if the taxpayer failed or was unable to make the return on a strict receipts and disbursements basis.

The converse of the principle thus stated requires that the gross income from which accrued deductions are to be taken must include all the items of income properly accruable during the period for which the deductions are to be taken, and that a taxpayer's net income is not clearly shown unless all the items of income are first set up and included in the amount from which the accrued deductions are subtracted.

In the instant case, the Government provided for the payment to the taxpayer, during the years from January 1, 1918, to March 1, 1920, as just compensation for the use and occupation of its properties, of an amount equivalent to the so-called standard return, or such greater amount as might have been agreed upon, and that such payments should be made *annually in convenient installments during all of that period.* These payments were provided for in order that the amount so determined might become the annual income of the taxpayer and might also bear their proportion of the tax

revenues payable to the Government during that period. The full amount of just compensation, as measured by the so-called standard return, was known both to the Government and to the taxpayer during all of the years 1918, 1919 and 1920, and all of that amount definitely accrued by virtue of the Federal Control Act of March 21, 1918, and that amount, or in the absence of agreement not less than 90 per cent thereof, was payable to the taxpayer in convenient installments throughout that period. This taxpayer, in common with all others, owed to the people of the United States the duty of contributing annually its fair proportion of the burden of war taxation, and it should not in good conscience now be permitted to claim that, because it then declined to enter into a contract with the Railroad Administration, or to receive payments of 90 per cent of the amount provided for by the standard return, it should escape its just proportion of war taxes.

Applying the reasoning of the *Anderson* case, *supra*, to the agreed facts of the case at bar, it appears that this taxpayer had a consistent practice of keeping its books of account upon an accrual basis, and that under such system of accounting all its gross income from whatever source should have been entered upon its books. Finding that a part of such gross income was omitted from the taxpayer's books of account for the years 1918, 1919 and 1920, we must hold that such books of account must now be treated in the same manner as they would be had such items of gross income been properly accrued and entered upon the books. Having now before us for review the income and profits-tax returns for the years 1918, 1919 and 1920, when all differences as to the true amount of the accrued income for those years have been adjusted, the true income and profits-tax liability for the several periods must be computed upon the basis of the accrual during those periods of the true amount of income as finally settled.

We are, therefore, of the opinion that the income and profits-tax liability of this taxpayer for the years 1918, 1919 and 1920, should be computed, after having added to the gross income for the years 1918 and 1919 the sum of $180,377.56, respectively, and for the year 1920 the sum of $30,062.93, and that the deficiencies be computed upon the amount of resulting net income for each of said years at the rates of tax prescribed for each year, respectively, and subject to such adjustments of invested capital as heretofore determined by the Board to be authorized by law.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*

GREEN, MARQUETTE, MILLIKEN, MORRIS, SMITH and STERNHAGEN dissent.