KANSAS CITY SOUTHERN RAILWAY CO. AND AFFILIATED COMPANIES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12054.   Promulgated May 24, 1929.

666

Fred R. Angevine, Esq., for the petitioner.
P. M. Clark, Esq., for the respondent.
Robert N. Miller, Esq., and John E. McClure, Esq., as amici curiae.

## OPINION.

Morris: Substantially all of the facts herein are founded upon stipulations entered into between the parties.

The question raised by the first two allegations of error, that is, the proper basis for taxing compensation due and payable to railroads during the period of Governmental operation and control, has

been presented to this Board in several cases involving facts similar in all material respects to these here, *Illinois Terminal Co.*, 5 B. T. A. 15; *New Orleans, Texas & Mexico Railway Co.*, 6 B. T. A. 436; *Great Northern Railway Co.*, 8 B. T. A. 225; *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988, all of which have been reviewed from time to time and in some, distinctions have been made, but the general principles enunciated in *Illinois Terminal Co., supra*, have been strictly adhered to, and while the respondent has presented a lengthy argument in an attempt to distinguish the facts in the instant proceeding, we have been unable to find any sound reason in law or in fact why these principles should not be applied here. We, therefore, conclude that the amount finally determined as compensation should be prorated over the period of Federal control.

Interest earned by the petitioner, referred to in allegation numbered 3 herein, from the United States Government on additions and betterments is taxable income (see discussion hereinafter with respect to other interest received from the United States Government) and should be included in the computation of gross income for the years 1918, 1919, and 1920, in which it accrued. *Texas & Pacific Railway Co.*, 9 B. T. A. 365.

The fourth and fifth allegations of error are with respect to deductions of certain amounts in the computation of net income for the years 1918 and 1919 which were charged to depreciation. Section 234 (a), and subsection (7), of the Revenue Act of 1918, provide:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230, there shall be allowed as deductions:

\* \* \* \* \* \* \*

(7) A reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

It appears from the stipulated facts, and from the testimony offered by the petitioner, that because of changing conditions and increasing traffic and competition in the railroad business, extensive improvements were necessitated over its line, contemplating not only many changes on the original right of way, but also a number of changes by way of substitution of short sections of road on new ground, where that method was found to be more economical; that the program of improvements was commenced in 1909, and completed in 1912, involving about 41 per cent of the entire line and expenditure of several millions of dollars; and, further, that the road at each of the several points where new locations were utilized was in no way worn out, was fully maintained, and capable of performing, for an indefinite time, the function for which it was originally constructed; that the changes were made for the purpose of increasing the capacity of the line to secure economical operation and to render improved

service; that grade revisions were completed by removing the tracks to adjacent parcels of ground, procured and substituted for the original parcels, the use of the latter being discontinued. The evidence reveals also that in addition to the grade revisions the petitioner constructed in 1909–1912 a new and enlarged shop terminal plant at Shreveport on a new and different location from that of another terminal plant which it owned in 1909, and which was also located at Shreveport, having equipment which was not worn out or obsolete, and which was capable, with ordinary running repairs, of performing for an indefinite term the functions for which it was originally constructed; and that upon completion of the new plant the old terminal was abandoned. Under date of February 3, 1914, the petitioner was authorized by the Interstate Commerce Commission to spread the amounts of *estimated cost*, less salvage, of replacing the discontinued portion of the road, and the estimated replacement value, less salvage, of the terminal plant, over a period of 15 years from the date of the expenditures. Accordingly, the petitioner charged to its monthly operating expenses, during the years 1918 and 1919, amounts aggregating $89,181.72 and $89,993.40, respectively, which amounts were claimed as deductions in the computation of its net income for these years.

Petitioner admits in its brief that the instant question presents a rather unusual phase of depreciation and in this we must heartily concur, but it points to the fact that the Supreme Court of the United States, in *Kansas City Southern Railway Co.* v. *United States of America and Interstate Commerce Commission*, 231 U. S. 423, has defined the subject matter as depreciation or obsolescence, in support of its contention. We have examined the report of that case, rendered during the October term of 1913, and we find that the court, speaking through Mr. Justice Pitney, said:

A more complete depreciation than that which is represented by a part of the original plant that through destruction or obsolescence has actually perished as useful property, it will be difficult to imagine.

The court states further in that case:

\* \* \* The other kind of depreciation is the result of changes attributable to the inadequacy of the existing property to meet the demands of the future. The road or the structures have to be replaced with stronger or more efficient instrumentalities. Abandonments occasioned by changes of this character are therefore chargeable to future earnings, for the reason that the improved condition of the road is not only designed to meet the demands of the future, but presumably will result in economies of operation, and so the resulting benefits will be reaped by those who hold the stock of the company in the present and in the future. The railroad company may, if it sees fit, anticipate general depreciations, and make provision for them by establishing a reserve for the purpose; but if no such provision has been made the abandonments should be taken care of by charging them to present or future operating ex-

pense. In case, however, the amount is so large that its inclusion in a carrier's operating expenses for a single year would unduly burden the operating expense account for that year, the carrier may, if so authorized by the Commission, distribute the cost throughout a series of years.

A statement of the theory is sufficient to show that the regulation is not arbitrary in the sense of being without reasonable basis. And there is evidence to show that the Commission was warranted in adopting it, as sustained by expert opinion and approved by experience.

Although the Supreme Court held that these amounts represented depreciation or obsolescence and that they should be charged to future earnings, the court was not considering or interpreting the statutory provision for the deduction from gross income under the revenue acts of exhaustion, wear and tear of property used in the trade or business, nor did it attempt to determine how far into the future the amounts should be spread. It is true that the Interstate Commerce Commission permitted 15 years as the proper basis for allocation, but this we consider was purely arbitrary, and was only for the purpose of relieving the financial statements during the earlier years of these extremely burdensome charges, and not for the purpose of allocating to future years expenses or operating costs incident to the earnings for those years.

The allowance for exhaustion, wear and tear of property or obsolesence thereof as provided for in section 234 (a) (7), *supra*, is an annual deduction and is based upon the exhaustion sustained during the taxable year in question. *Morris & Bailey Steel Co.*, 9 B. T. A. 205. Clearly, there is no exhaustion sustained during the taxable year on an asset which was abandoned or scrapped long prior thereto. The revenue acts provide for a deduction in the year in which the asset was discarded. *Evanston National Bank*, 1 B. T. A. 9; *Winter Garden, Inc.*, 10 B. T. A. 71; *Dilling Cotton Mills*, 2 B. T. A. 127. The respondent's determination in this particular must, therefore, be sustained.

In order that consideration of the issue raised by allegation of error numbered 6 herein may not become confused because of the several angles from which the question has been argued by counsel for the petitioner and the respondent, it is well to have before us, at the very outset, the issue as it has been presented in the petition, which is, that the respondent erred in refusing to deduct, in the computation of net income for the year 1919, $87,942.89 for loss on account of investment in stock of the Mena Land & Improvement Co. Therefore, it is only necessary for us to determine what the investment in the stock of that company was and whether a loss on account of said investment was actually sustained as alleged.

The respondent has, by affirmative allegation numbered 19 herein, averred that of the foregoing amount, to wit, $87,942.89, $36,065.07 has been allowed as a deduction and that error was committed in

said allowance; that no deduction of any amount should be allowed because of this transaction, and, furthermore, that he committed error in failing to include in the taxable income for 1919 the profit derived by the petitioner in the sale of said stock. Therefore, if we determine that no loss was sustained in this transaction it is incumbent upon us to determine whether a profit was actually derived as alleged by the respondent.

A brief review of the facts here may aid in the solutions of the questions at issue. To begin with it is clear that the petitioner caused the Mena Land & Improvement Co. to be organized in July of 1910 for the purpose of acquiring the homes of certain of its employees at Mena, so that they might be saved from hardship due to the removal of the Mena division point to other points, and, furthermore, that in 1910 it acquired the entire capitalization of the Mena Land & Improvement Co. for $25,000, which it recorded in its books of account as an asset in November of 1910 and January of 1911. Thus it will be seen that the petitioner's initial investment was $25,000.

The petitioner in effect contends, however, that the sum of $25,000 was not the entire investment in the Mena Land & Improvement Co., but that certain advances made by it to that company for the acquisition of properties, less certain amounts received and applied against these advances, should be added to that amount in determining the investment. Let us proceed further with the facts and circumstances surrounding these advances and the ultimate sale of the stock which is alleged to have resulted in the loss here in dispute.

It appears that the Mena Land & Improvement Co. began immediately in 1910 to carry out the purpose for which it was organized, and to purchase the properties of employees situated at Mena, at cost to them, and that the petitioner advanced sums of money to that company aggregating $136,200, over and above the $25,000, the amount of the capital stock; that said advances were made between September, 1910, and April, 1918; that they were carried on the books of the petitioner " in open account " as advances to the Mena Company and were carried on the petitioner's balance sheet as an asset. As the Mena Land & Improvement Co. sold real estate, if it was not in need of the cash proceeds from said sale or sales, they would be paid over to the petitioner to apply on the advances so made, and the petitioner received during that period $28,340 from the sales of such real estate, leaving a balance due at the date of the sale, hereinafter discussed, of $107,860. It further appears that on May 28, 1919, the petitioner sold the capital stock of the Mena Land & Improvement Co. to certain individuals for $40,000, under an agreement by which it reserved to itself all rentals due upon the properties at the date of that agreement which had accrued to March

15, 1919, and the cash on hand on said date, together with the accrued rentals to March 15, 1919, collected since that date. Under that provision of the agreement the petitioner received $3,646.30. The petitioner paid out commissions and other expenses incident to the aforesaid sale, aggregating $1,633.84.

Another agreement was entered into with respect to the sale aforesaid on May 28, 1919, by which the petitioner released the purchasers of the capital stock, under the agreement hereinbefore discussed, of any and all claims it may have on account of advances to the Mena Land & Improvement Co., in the approximate amount of $108,000.

There is nothing in the record to indicate, or even to intimate, that the advances made by the petitioner to the Mena Land & Improvement Co. ever became, or were ever intended to become, payments on account of the subscription or purchase of that company's capital stock. On the other hand, it appears very clearly from the manner in which these advances were recorded in the petitioner's books of account that they were intended, certainly at the time they were made, to be collected in full from that company. In fact, certain payments were made from time to time and applied against that indebtedness. How, then, can it be said that the investment in the capital stock upon which the loss is predicated should be enhanced by the amount of these advances? We are of the opinion that it should not be. It is quite clear, therefore, from what we have said that the petitioner's investment in stock of the Mena Land & Improvement Co. was $25,000, and no more.

Having determined the amount of the petitioner's investment in the transaction aforesaid, and bearing in mind the exact issue raised by the pleadings, the inescapable conclusion is that the petitioner sold its capital stock for $40,000 and realized a profit therefrom of the difference between $25,000 and $40,000, or $15,000, less the expenses incident to the sale.

The seventh and eighth allegations of error urged by the petitioner pertain to additional deductions on account of amortization of bond discount in the computation of net income for 1918 and 1919.

The respondent, by way of affirmative allegation in his answer, numbered twenty herein, states that for 1918 and 1919 discount in the amount of $46,577.57 has been allowed as a deduction in the computation of net income, and having been so allowed, he avers that error was committed in said allowance and, furthermore, that no deduction should be allowed on account of amortization of bond discount for either of said years.

Following *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988, we hold that the petitioner is entitled to deduct, in each of the taxable years here in controversy, that portion of the bond discount

obtained by dividing the total discount by the number of years the bonds are to run.

Respondent concedes error with respect to "donations" for the construction of spur tracks and facilities on the right of way of the petitioner. We have previously held that such amounts received by a railroad company are not taxable income. *Great Northern Railway Co., supra.*

Errors numbered 11 and 12, urged by the petitioner, are the failure of the respondent to exempt from taxable income for the years 1918 and 1919, $199,883.92 and $327,721.74, respectively, being interest due the petitioner from the United States Government. The petitioner contends that these items of interest are upon "obligations of the United States" and therefore exempt from taxation. The respondent contends that those amounts were not upon obligations of the United States within the meaning of the statute, and, furthermore, in discussing the amounts due to the Director General, he contends that they have been allowed as deductions from gross income for the years in question.

What the respondent actually did in computing the deficiency here in controversy, as he points out in his brief, was to take the difference between $199,883.92 and $327,721.74, interest due the petitioner from the United States Government and $174,165.98 and $326,315.12, the interest due from the petitioner to the United States Government, a difference of $27,124.56 in favor of the petitioner, which he added to the petitioner's net income for the two years in question.

Since the question of the deductibility of interest due from the petitioner to the United States Government has been separately placed in issue in assignments of error numbered 14 and 15, and the taxability of interest due the petitioner from the United States Government has been raised in the assignments of error here being considered, and, furthermore, since the principles to be applied in disposing of these separate issues are different, because separate and distinct sections of the Revenue Act are involved, we shall consider here the taxability of the interest due the petitioner, and hereafter, under assignments of error numbered 14 and 15, the deductibility of interest due from the petitioner to the United States Government.

Section 213 of the Revenue Act of 1918 provides that "gross income,"

\*         \*         \*         \*         \*         \*         \*

(b) Does not include the following items, which shall be exempt from taxation under this title:

\*         \*         \*         \*         \*         \*         \*

(4) Interest upon * * * (b) securities issued under the provisions of the Federal Farm Loan Act of July 17, 1916; or (c) the obligations of the United States or its possessions; or (d) bonds issued by the War Finance Corpora-

tion: * * *. In the case of obligations of the United States issued after September 1, 1917, and in the case of bonds issued by the War Finance Corporation, the interest shall be exempt only if and to the extent provided in the respective Acts authorizing the issue thereof as amended and supplemented * * *.

The exact language here under consideration, that is, "obligations of the United States," was first read into the Act of October 3, 1913, and has since been included in each succeeding revenue act. In addition to the exemption granted to taxpayers holding "obligations of the United States," the Act of September 8, 1916, first provided for exemption of interest upon "securities issued under the provisions of the Federal Farm Loan Act." That Act, as amended by the Act of October 3, 1917, granted the exemption theretofore provided for on obligations issued after September 1, 1917, to the extent of the amount provided "in the Act authorizing the issue thereof." The Revenue Act of 1918, which is the one here under consideration, granted an additional exemption on interest upon "bonds issued by the War Finance Corporation."

The question presented is novel, notwithstanding that we have already considered several cases involving interest paid to railroads on the use of their property by the Government during Federal control. *Illinois Terminal Co., supra; Great Northern Railway Co., supra; Texas & Pacific Railway, supra; Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279. No question was raised by those petitioners as to the taxability of the interest, but merely the year in which such interest should be included in gross income. A concurrence in the present petitioner's contention results in the conclusion that the so-called interest is exempt from tax while the obligation upon which the interest is paid is taxable. The petitioner contends that the obligation to pay just compensation on account of the taking over of the railroad by the Federal Government, and to pay interest on such compensation until the same was paid in full, is an obligation of the United States. Several questions are bound up in the contention: What is an obligation?; what is the basis or authority for the payment of the amount in question in this proceeding?; was it the payment of interest on an "obligation of the United States" as that expression is used in section 213 (b) (4) of the Revenue Act of 1918?

The word obligation "is in its general and most extensive sense, synonymous with duty"; it has been defined "to be 'the constraining power or authoritative character of a duty, a moral precept, a civil law, or a promise or contract voluntarily made; that to which one is bound; that which one is obliged or bound to do, especially by moral or legal claim; a duty.'" The word as used in a will reciting, "Whereas, I now hold obligations against certain of my friends, I

direct my executor not to urge the payment of any such obligations before the space of two full years after my decease " has been defined to mean " a written instrument like a note or bond "; in a strictly technical sense is has been defined to mean a " bond." See Words and Phrases, First Series, vol. 6, pp. 4878–79.

Thus it will be seen that the word obligation may include, in the broader sense, a mere duty, or it may mean a contract, either express or implied, and in a stricter sense, it may be confined to bonds or other similar evidences of indebtedness.

The Act entitled "An Act To provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes," 40 Stat. 451, called the " Federal Control " Act, approved March 21, 1918, authorized the President to agree with and to guarantee to carriers just compensation during the period of Federal control " not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June thirtieth, nineteen hundred and seventeen." That Act provided that:

Every such agreement shall also contain adequate and appropriate provisions for the maintenance, repair, renewals, and depreciation of the property, * * * and for such accounting and adjustments of charges and payments, both during and at the end of Federal control as may be requisite in order that the property of each carrier may be returned to it in substantially as good repair and in substantially as complete equipment as it was in at the beginning of Federal control, and also that the United States may, by deductions from the just compensations or by other proper means and charges, be reimbursed for the cost of any additions, repairs, renewals, and betterments to such property not justly chargeable to the United States; * * *

Section 4 of that Act with respect to additions and betterments provided:

That the just compensation that may be determined as hereinbefore provided by agreement or that may be adjudicated by the Court of Claims, shall be increased by an amount reckoned at a reasonable rate per centum to be fixed by the President upon the cost of any additions and betterments, less retirements, and upon the cost of road extensions to the property of such carrier made by such carrier with the approval of or by order of the President while such property is under Federal control.

Section 2 of that Act provided:

That if no such agreement is made, or pending the execution of an agreement, the President may nevertheless pay to any carrier while under Federal control an annual amount, payable in reasonable installments, not exceeding ninety per centum of the estimated annual amount of just compensation, remitting such carrier, in case where no agreement is made, to its legal rights for any balance claimed to the remedies provided in section three hereof. Any amount thereafter found due such carrier above the amount paid shall bear interest at the rate of six per centum per annum. The acceptance of any benefits under this section shall constitute an acceptance by the carrier of all the provisions of this Act and shall obligate the carrier to pay to the

United States, with interest at the rate of six per centum per annum from a date or dates fixed in proceedings under section three, the amount by which the sums received under this section exceed the sum found due in such proceedings.

The taking over of the petitioner's property was an exercise by the Government of its sovereign power of eminent domain. *North Carolina R. Co.* v. *Lee,* 260 U. S. 16; *Phelps* v. *United States,* 274 U. S. 341; *Illinois Terminal Co., supra.* Such act immediately set in motion the petitioner's constitutional right to just compensation for the use of its properties. The Government's obligation, and it was undoubtedly that in the broad sense of the word, was to pay just compensation. What just compensation is, has already been determined by the Supreme Court of the United States in *Phelps* v. *United States, supra.* The facts in that case are that the Secretary of War by direction of the President, pursuant to an Act of August 29, 1916, 39 Stat. 619, and an Act of August 10, 1917, 40 Stat. 276, requisitioned a pier which the plaintiffs leased. The plaintiffs continued to pay rent to the lessor, and in accordance with the findings of a board of appraisers created for the purpose of ascertaining fair compensation for the temporary use of the property, the amount of such payments, $79,890.42, was repaid the plaintiffs by the United States. The board also found the value per month of the use of · the plaintiffs' property, less the monthly rents paid. That amount was not satisfactory to plaintiffs; they elected to take 75 per cent of the award and sued to recover an amount to make up just compensation. The court found the value per day of the use of their property, and the difference between that amount and the amount already paid was included in the judgment entered March 8, 1926. The plaintiffs contended that there should be added such sums as would produce the equivalent of the value of the use of the leased property paid contemporaneously; and that interest at a reasonable rate from the date of the use to the time of payment was a good measure of the amount to be added in order to make just compensation. The action was brought under section 145 of the Judicial Code. That section gives to the Court of Claims jurisdiction to hear and determine " all claims (except for pensions) founded upon the Constitution of the United States or  *  *  *  upon any contract, express or implied, with the Government of the United States  *  *  *." Section 177 provides " that no interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for its payment." In the course of its opinion the court used the following language:

 *  *  * Under the Fifth Amendment plaintiffs were entitled to just compensation; and, within the meaning of §145 the claim is one founded on the Constitution. Moreover, it has long been established that, where pursuant to

an Act of Congress private property is taken for public use by officers or agents of the United States, the Government is under an implied obligation to make just compensation. That implication being consistent with the constitutional duty of the Government as well as with common justice, the owner's claim is one arising out of implied contract. *United States* v. *Great Falls Manufacturing Co.*, 112 U. S. 645; 656; *Duckett* v. *United States*, 266 U. S. 149, 151; *Campbell* v. *United States*, 266 U. S. 368, 370 \* \* \*. Plaintiffs' property was taken before its value was ascertained or paid. Judgment in 1926 for the value of the use of the property in 1918 and 1919, without more, is not sufficient to constitute just compensation. Section 177 does not prohibit the inclusion of the additional amount for which petitioner contends. It is not a claim for interest within the purpose or intention of that section. Acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution. The Government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken. They are entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking. As such payment has not been made, petitioner is entitled to the additional amount claimed.

The situation with respect to the payment of part of the amount in question in the instant proceeding is parallel. Although this payment was designated interest, it was in effect not interest within the purpose or intention of the statute, but merely the satisfaction of the obligation itself, namely to pay just compensation. It was the return to the petitioner of the " full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking." Section 4 of the Federal Control Act designates part of the amount in question as compensation reckoned at a reasonable rate per centum.

There are further considerations which lead us to the conclusion that the petitioner's contention is fallacious. Although the word " obligation " is broad enough to cover the duty resting upon the Government to pay just compensation, we are of the opinion that its application is more restricted under section 213 (b) (4) of the Revenue Act of 1918. We have examined the Congressional record so far as practicable with respect to all the acts containing these exemption clauses, but unfortunately we find no expressions upon the part of the legislators which would aid in determining precisely what should be treated as an obligation under the statute. The apparent purpose for exempting from taxation the interest upon obligations of the United States was to facilitate the flotation of low-interest-bearing Government securities, thus partially compensating for the higher interest rates of competitive private issues. The reason for the exemption does not apply to interest on obligations, construing that word in the broad sense for which the petitioner contends.

The revenue acts throw additional light upon the Congressional intent. It was early recognized that if interest was not to be taxed,

interest paid on money borrowed to purchase nontaxable, interest-bearing securities should not be deducted. In the Revenue Act of 1916, as amended by the Revenue Act of 1917, the following provi-. sion appears (Section 1201 (a) (2)):

All interest paid within the year on his indebtedness except on indebtedness incurred for the *purchase* of obligations or securities the interest upon which is exempt from taxation as income under this title.

The Revenue Act of 1918, sections 214 and 234, contains a similar exception on interest on indebtedness " incurred or continued to *purchase or carry* obligations or securities," etc. Section 213 (a) of the 1918 Act makes special provision for " *obligations issued* " after September 1, 1917. The words " purchased " and " issued " used in connection with obligations connotes a more restricted use of the word " obligation " than that contended for by the petitioner.

In *Hibernia Savings & Loan System* v. *San Francisco*, 200 U. S. 310, an action was begun in the State Superior Court to recover certain taxes paid under protest upon certain checks or orders signed by the Treasurer of the United States and addressed to the Treasurer or an Assistant Treasurer of the United States, for interest accrued upon certain registered bonds of the United States owned by the plaintiff. These checks were issued in compliance with Rev. Stat., sec. 3698, which requires that " the Secretary of the Treasury shall cause to be paid, out of any money in the Treasury not otherwise appropriated, any interest falling due, or accruing, on any portion of the public debt authorized by law." The checks, which were payable at the United States Treasury at San Francisco at any time within four months from their date, were not presented immediately for payment but were withheld by the plaintiff until the first Monday in March, 1899, the day when the status of property, for the purpose of taxation, was determined. Plaintiff did not list those checks for assessment; but the assessor in making up his roll for the ensuing year, included them, and, after fruitless effort to be relieved from the assessment, the plaintiff paid the amount of the tax and brought suit to recover. The question presented to the court there was whether the two checks or orders were exempt from State taxation under Rev. Stat., sec. 3701, which provided that " all stocks, bonds, treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority." The court there said:

* * * The basis of this exemption is the fact that a tax upon the obligations of the United States is virtually a tax upon the credit of the Government, and upon its power to raise money for the purpose of carrying on its civil and military operations. The efficiency of the Government service cannot be impaired by a taxation of the agencies which it employs for such service,

and, as one of the most valuable and best known of these agencies is the borrowing of money, a tax which diminishes in the slightest degree the value of the obligations issued by the Government for that purpose impairs *pro tanto* their market value.

\* \* \* \* \* \* \*

The principle, however, upon which this exemption is claimed does not apply to obligations, such as checks and warrants intended for immediate use, and designed merely to stand in the place of money, until presented at the Treasury and the money actually drawn thereon. In such case the tax is virtually a tax upon the money which may be drawn immediately upon presentation of the checks.

\* \* \* \* \* \* \*

Had the Government, in the absence of money for the immediate payment of interest upon its bonds, issued new obligations for the payment of its interest at a future day, it might well be claimed that these were not taxable, as the taxation of such notes would, to the extent of the tax, impair their value and negotiability in the hands of the holder.

\* \* \* \* \* \* \*

\* \* \* While the checks are obligations of the United States and within the letter of §3701, they are not within its spirit, and are proper subjects of taxation.

In *Bank of Commerce* v. *Tennessee for the use of Memphis et al.*, 161 U. S. 134, the court, in considering the question of exemption, said:

These cases [meaning *New Orleans City & Lake Railroad* v. *New Orleans*, 143 U. S. 192, 195; *Vicksburg & Pacific Railroad* v. *Dennis*, 116 U. S. 665, and many cases there cited; *Farrington* v. *Tennessee*, 95 U. S. 679, 686; *West Wisconsin Railway* v. *Supervisors*, 93 U. S. 595; *Tucker* v. *Ferguson*, 22 Wall. 527] show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out. Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of any one to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language. There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well founded doubt is fatal to the claim; no implication will be indulged in for the purpose of construing the language used as giving the claim for exemption, where such claim is not founded upon the plain and clearly expressed intention of the taxing power.

In *Citizens Bank* v. *Parker*, 192 U. S. 73, Mr. Justice Brewer, with whom the Chief Justice concurred, dissenting, cited the language used by that court in *Phoenix Insurance Co.* v. *Tennessee*, 161 U. S. 174, in which it said:

\* \* \* It must alway be borne in mind in construing language of this nature that the claim for exemption must be made out wholly beyond doubt; for, as stated by Mr. Justice Harlan, in *Chicago, Burlington & Kansas City Railroad* v. *Guffey*, 120 U. S. 569, 575; "It is the settled doctrine of this court that an immunity from taxation by a State will not be recognized unless granted in terms too plain to be mistaken."

Mr. Justice Brewer then cited language which we have quoted from *Bank of Commerce* v. *Tennessee et al., supra,* and he said:

Only last term the same doctrine was reaffirmed in *Theological Seminary* v. *Illinois,* 188 U. S. 662, 672, in these words:

"The rule is that, in claims for exemption from taxation under legislative authority, the exemption must be plainly and unmistakably granted; it cannot exist by implication only; a doubt is fatal to the claim."

I make these quotations, which are in harmony with the many other decisions of this court, for even the most casual examination of them makes it apparent that the rule therein stated is plainly ignored in this case, and that a term, whose meaning is well understood, is stretched beyond its ordinary significance and to its utmost limits in order to include the alleged exemption.

The Congress first exempted obligations of the United States in general terms. It later saw fit to expressly exempt securities under the provisions of the Federal Farm Loan Act and bonds issued by the War Finance Corporation. We do not believe, however, that it intended to distinguish between bonds and securities, as such, and obligations of the United States, or to broaden the scope of that provision beyond the already understood and generally accepted meaning of that term. It merely sought to add to, by way of definiteness, the securities of the Federal Farm Loan Board and War Finance Corporation, leaving the term " obligations of the United States " to cover all other bonds or other similar evidences of indebtedness issued by the United States but not specifically mentioned in the Act.

It is not necessary that we attempt to detail in this opinion what the term " obligations of the United States " includes or to define the exact meaning thereof. It is only necessary for us to say that we believe the payment of interest under the circumstances of this case was not within the spirit and intendment of section 213 of the Revenue Act of 1918. Said interest should be included in the computation of gross income for the years in which it accrued. *Texas & Pacific Railway Co., supra.*

· Allegation of error numbered 13 herein was expressly withdrawn by counsel for the petitioner at the hearing of this proceeding.

The question raised by allegations of error numbered 14 and 15 is the deductibility of interest due from the petitioner to the United States Government. As we have heretofore pointed out in discussing the taxability of interest due from the United States Government to the petitioner, the respondent, in the computation of the deficiency, treated these two classes of interest jointly, that is, he took the net difference between the interest due from the Government and the amount due the Government and added it to the petitioner's net income. The respondent states in his brief, as we have also pointed out, that the amounts of interest due the Government from the petitioner have been allowed as deductions, and this it appears is so, except that it has been done in such a manner

as to require a segregation of the separate items and a separate discussion and consideration thereof.

Section 234 (a) of the Revenue Act of 1918 and subsection 2 thereunder, in so far as applicable here, read:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*    \*    \*    \*    \*    \*    \*

(2) All interest paid or accrued within the taxable year on its indebtedness, except on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917) the interest upon which is wholly exempt from taxation under this title as income to the taxpayer, \* \* \*.

Since the respondent has admittedly allowed this deduction, as indicated hereinabove, and since it appears from the stipulated facts that the amounts claimed as deductions were due and payable to the United States for the years 1918 and 1919, we are satisfied that the deductions as claimed should be allowed, as such, in the redetermination of the deficiency here in controversy.

The petitioner, by stipulation with the respondent, admits that the action of the respondent complained of in allegation of error numbered 16, is correct.

The question raised by allegation of error numbered 17 has been fully considered and disposed of in accordance with the contention of the petitioner in *Western Maryland Railway Co.*, 12 B. T. A. 889.

In recomputing the amount of net income for 1918 there should be added thereto $800.46, erroneously eliminated therefrom in that year as alleged in error urged by the respondent numbered 18 herein.

The respondent admits, by stipulation with the petitioner, that the petitioner's taxable income for the year 1918 was overstated, and should be reduced by $59,728.39, due to the restoration by the petitioner to said net income of $179,185.09, instead of $119,456.70, amount of income and profits taxes accrued by the petitioner for that year. This admission has no bearing whatsoever upon the allegations of error set forth herein, but is for the purpose of correcting, upon redetermination, an error made in the former computation, in accordance with the agreed stipulation of the parties.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

STERNHAGEN and MURDOCK dissent in part.

---

MILLIKEN dissents concerning the loss claimed in connection with the Mena Land & Improvement Co. and concurs in the result concerning the claim that the interest due from the United States was exempt from taxation.