*1164 OPINION.
Muedock:
The petitioner has failed to prove that within the meaning of the Revenue Act of 1918 it sustained in 1920 and properly accrued on its books a loss of $10,614.12, the result of a railway accident in which a man was killed. The petitioner appealed from the decision of the Insurance Commission and thus contested the claim that it was liable. We can not determine from the few facts stipulated that there was such a certain and definite liability on the part of the petitioner in 1920 to pay the amount of the award as to justify the accrual in that year. The stipulation that the amount of the award was accrued in the taxable year and the decision affirmed in the following year does not in the absence of other explanatory facts entitle the petitioner to judgment. Lane Construction Corporation, 4 B. T. A. 1133. See also Consolidated Tea Co. v. Bowers, 19 Fed. (2d) 382.
The Commissioner has held that the petitioner realized taxable income in the amount of $121,750.45 because certain materials and supplies which cost it $113,091.13 were converted into $234,841.58 in cash or a cash credit. He states the issue correctly as follows:
Did the taxpayer realize income in the sum of $121,750.45 in either the year 1921 or the year 1920 on account of the payment to it by the Director General for materials and supplies taken over but not returned, such payment being in excess of the cost of the unreturned materials and supplies by the said amount of $121,750.45?
The petitioner argues that an analysis of the legislative, executive and administrative acts of the United States Government in connection with Federal control of railroads shows that the Government intended to compensate the railroads for the possession, control, operation and utilization of their properties and, after the period of Federal control, to return the properties to the owners in substantially as good repair and in substantially as complete equipment as they were in when taken over by the Government; this was a distinction between capital and income and the same distinction should be made for income-tax purposes; and whatever cash was paid by the Government to the petitioner to make up a shortage in inventory of materials and supplies merely made capital whole and did not give rise to income.
The acts relating to Federal control should be read with the revenue acts in order to determine the intent of Congress, but we do not believe that Congress ever indicated in any act relating to Federa) control of the railroads that circumstances such as are present in this case could not give rise to income. Particularly is this so when we consider the Commissioner’s regulations and certain provisions of the Revenue Act of 1921. Under the revenue acts, if a *1165 person parts with his property and, as a result, receives cash or its equivalent in excess of the cost or, in a proper case, the March 1, 1913, value of the property, he has received income. This is so whether he parted with the property voluntarily or involuntarily.
Under the Revenue Act of 1918, the Commissioner of Internal Revenue by Regulations 45, articles 49 and 50, provided a way whereby one whose property had been converted into cash, under circumstances similar to those in the present case, could relieve himself from tax liability on the income resulting from the conversion. The Revenue Act of 1921, in sections 202 (d) (2) and 234 (a) (14), recognized and incorporated such a method of relief in the law and in the latter provided, in part, that:
* * * If tlie taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted * * * then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds. * * *
Pursuant to the above statute, the Commissioner promulgated Regulations G2, containing, inter alia, articles 49, 261, 262 and 263. Article 49 provided that the gain should be included in gross income, but if the taxpayer proceeded forthwith in good faith to replace the property as provided in section 214 (a) (12), then articles 261 to 263, inclusive, should be followed. Article 261 required that the newly restored property should not be valued in the accounts of the taxpayer at an amount in excess of the cost or March 1, 1913, value of the old property. This feature of the Commissioner’s regulations, which was the same both before and after the passage of the Revenue Act of 1921, seems to us to be a reasonable provision and the sort of a provision that Congress expected would be made. Otherwise, during a period of rising prices, the conversion would not only result in no harm to the owner of the property from an income tax standpoint, but would improve his position for income-tax purposes in that the restored property would go through his accounts at a higher cost than the cost or March 1, 1913, value of the property which was converted. In view of the method thus provided, whereby the petitioner could have been relieved of all tax in regard to the income now in controversy without at the same time laying a basis for a double deduction by a reduction of its future income, we can not read any inhibition in the acts relating to Federal control which would preclude the possibility of income to the petitioner from the transaction set forth in the findings of fact in this case. New York, Ontario & Western Railway Co., 1 B. T. A. 1172, is clearly distinguishable.
The question with which we are concerned is whether or not the petitioner had income which it should have reported. The question *1166 of a deduction from income has not been raised. But even if such a question were in issue the evidence shows that the petitioner has not complied with the regulations of the Commissioner and is not entitled to deduct any amount because of the expenditure of the proceeds of the conversion in the acquisition of other property of a character similar or related in service or use to the property so converted. In the first place, its claim that it has replaced the property converted is not very clearly supported by the evidence. If a railroad annually purchases a certain amount of materials and supplies and, on a certain date, has a quantity of materials and supplies on hand, which quantity then on hand is taken from it, has it shown that it has replaced the quantity on hand by showing that in subsequent years it purchased the usual quantity of materials and supplies, or only slightly in excess of the usual quantity, the amount of which excess is not shown? Regardless of the adequacy of the petitioner’s proof on this point, the evidence clearly shows that the regulation of the Commissioner in regard to the amount at which the restored property should be entered in the accounts has been totally ignored. But these matters would be material only in case the question of a deduction were before us and, as we have said, such a question is not before us.
The petitioner further argues that the “ lump sum settlement ” between it and the Director General can not be separated or broken down into component parts because the parties never reached any agreement as to the various items involved, and consequently a profit on the conversion of the materials and supplies can not be charged to the petitioner. It is true that the petitioner did not know the various amounts used by the Director General in his computation as a result of which his final offer was made. But despite this fact the petitioner was not in complete darkness, at the time of the final settlement, in regard to what the Director General was willing to allow on the various claims and particularly on the claim for süort-age in materials and supplies and in regard to what he did allow. During the period of Federal control the Director General had maintained a set of books in connection with the operation of the petitioner’s railroad. These books showed as of the end of 1920 the various amounts in various accounts due either from the Director General to the railroad or from the railroad to the Director General. So far as we have been able to determine the Director General never maintained that any greater amount was due him from the petitioner or that any lesser amount was due the petitioner from him than the amount shown by these books. The petitioner was aware of this fact and in 1920 actually entered on its books as accruals some of the amounts shown on the Federal books. In the final settle *1167 ment the only controversy between the parties and the only uncertainty which the petitioner might reasonably have had as to materials and supplies was as to any additional amount claimed and allowed on account of the shortage in materials and supplies over and above $234,841.58, the amount which the Federal books showed was due from the Director General to the petitioner on account of this shortage. In his computation of the net balance of $225,000 due to the corporation which the Director General finally allowed as a lump sum settlement it appears that he increased his allowance on account of the shortage in materials and supplies over the figure shown by the Federal books to $247,744.68, and then exactly offset the increase by entering a new item due to him from the petitioner. The petitioner did not know that the increase had been allowed and then offset. But in his computation of the income derived by the petitioner from the conversion, the Commissioner has disregarded the increase which the Director General made and is only contending that the petitioner received fhe lesser amount, $234,841.58, on account of the shortage of materials and supplies, and we believe that the petitioner knowingly received at least this amount of money on account of the shortage in materials and supplies.
The Commissioner computed the gain from the cash credit for the shortage in materials and supplies in this way: From $336,700.71, the cost of the inventory of materials and supplies taken over by the Director General as of January 1,1918, he subtracted $223,609.58, the cost of the inventory of materials and supplies turned back to the petitioner on March 1, 1920, and used the remainder as the cost of the materials and supplies which were not returned. The petitioner has contented itself with an argument that it would be more just and equitable to apportion the total cost of $336,700.71 or the total profit of $121,750.45 between the items for which cash compensation was given and the items returned in kind, in the proportion as $234,841.58, the cash returned to the petitioner, is to $223,609.58, the cost of the inventory returned to the petitioner. No good reason occurs to us why this particular method for estimating the cost should be adopted. If we knew the real cost of the property which was not returned we could accurately determine the income which the petitioner received from the cash credit. So far as we know, the actual cost could have been proven, but no effort was made to prove it.
We have not been told enough about the articles physically returned or replaced on March 1, 1920, to know whether or not or to what extent their cost was the same as the cost of the same or similar articles in the inventory turned over on January 1, 1918. The Commissioner subtracted the total cost shown by the March *1168 1, 1920, inventory from the total cost shown by the inventory of January 1, 1918, as if a dollar in one were the equivalent of a dollar in the other. If the Director General had purchased any article which he returned, since prices were generally rising, he might have bought it at a greater cost than the cost of a similar article in the inventory of January 1, 1918, and to this extent the Commissioner’s subtraction on a dofiar-for-dollar basis would have been erroneous. But we do not know whether or not he purchased any articles or the cost of any articles which he purchased or to what extent the articles which he turned back were the same articles which he had taken over. The petitioner in its brief states:
It is even possible, and highly probable in an inventory of this size that the inventory turned back contained many of the very units which were taken over.
The petitioner therefore has not shown that the Commissioner’s computation of income in the amount of $121,760.45 was in error.
Counsel for the respondent at the hearing contended that if the Board should not find that the income from this transaction was income for 1921, then it was income for 1920, on the theory that the amount of $234,841.58 finally allowed the petitioner in the lump sum settlement should have been accrued for 1920, when the properties were turned back. The respondent points out that the contract of March 26, 1919, in section 9 (b), made specific provision for the payment for any shortage in materials and supplies at the time the property was returned at prices prevailing at the end of Federal control; the shortage was known in 1920, and the prices were known; and a mathematical computation would have determined the amount due from the Director General, which computation was actually made on the books of the Director General as of December 31, 1920. Conceding the correctness of all of these facts, nevertheless the parties were in substantial disagreement in regard to this item and the respondent has failed to show that in 1920 the petitioner knew that it would get at least $234,841.58 on account of the shortage, and we can not say as a matter of law under all of the facts in this case that this amount should have been accrued at that time.
Reviewed by the Board.

Judgment will he entered wider Rule 50.

Phillips, GkeeN, MillikeN, and Van FossaN dissent.