MISSOURI PACIFIC RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33301. Promulgated February 20, 1931.

*Edward J. White, Esq.,* and *James M. Chaney, Esq.,* for the petitioner.

*D. A. Taylor, Esq.,* for the respondent.

270

276

278

OPINION.

PHILLIPS: The petition in this proceeding, as amended, raises 32 issues, each of which was numbered. The answer raised an issue which has been numbered 33. So far as seemed possible the facts have been set out under each numbered issue, but in several instances the same facts affect two or more issues. In such cases the facts are included under the earlier number and not repeated. We discuss the issues in the order in which they are numbered, except that all issues arising out of the Federal control settlement are grouped.

Under issue No. 3 the petitioner claims that the Commissioner committed error in reducing its deduction for operating expenses by $84,985.54. This is an amount which was set up on its books of account as representing the cost of transporting men and materials used in connection with betterments and improvements chargeable to capital account. The rate charged is a matter of estimate, but subject to control by the Interstate Commerce Commission. This issue was raised and fully discussed by the Board in *Great Northern Railway Co.*, 8 B. T. A. 225, and by the Circuit Court of Appeals

for the Eighth Circuit in *Great Northern Railway Co.* v. *Commissioner*, 40 Fed. (2d) 272; 282 U. S. 855. The case made by this petitioner is no better than that made in the case cited and on authority of that decision the action of the Commissioner in respect of this issue is sustained.

Issue No. 4 involves the question as to whether petitioner was affiliated with American Refrigerator Transit Company during the year 1920, and entitled to include the income and invested capital of that corporation in a consolidated return under section 240 of the Revenue Act of 1918. This same question was before us upon petition filed by American Refrigerator Transit Company, Docket No. 19019, in which proceeding the petitioner herein was permitted to intervene. There it was held that the two corporations were affiliated. *American Refrigerator Transit Co.*, 14 B. T. A. 616. In the present proceeding the parties have stipulated into the evidence a transcript of the evidence introduced in that proceeding. We have incorporated into our findings in this proceeding the findings made in the prior proceeding. Since both the parties now before us were parties in the case mentioned, we consider our decision there as binding on them.

Issue No. 5, involving the right of petitioner to deduct payments made to the Association of Railway Executives, is presented in a similar manner. The evidence on this point consists of the testimony of a witness as given in a prior proceeding and cross-examination of the same witness in a later proceeding, all incorporated into the record here by stipulating a transcript of such testimony. The cross-examination adds nothing to the record first made. We have incorporated as our findings those made in such prior proceeding (*Los Angeles & Salt Lake Railroad Co.*, 18 B. T. A. 168) upon the same testimony and upon authority of our decision in that case hold that the petitioner is entitled to deduct as an expense the amount contributed to the Association.

The sixth issue raises the question of the right of petitioner to deduct annually a part of the discount at which bonds had been issued by predecessor corporations, secured by property which was acquired by petitioner upon reorganization. Payment of such bonds was assumed by the petitioner. The respondent relies upon our decision in *Western Maryland Railway Co.*, 12 B. T. A. 889, while the petitioner relies upon the decision of the Circuit Court of the Fifth Circuit reversing that decision, *Western Maryland Railway Co.* v. *Commissioner*, 33 Fed. (2d) 695.

It is conceded that the obligations in question, consisting in part of equipment trust notes and in part of mortgage bonds, were sold at a discount and that the corporations issuing such bonds were en-

titled to deduct annually an aliquot part of such discount in computing their income for income tax purposes. *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988; *Western Maryland Railway Co.* v. *Commissioner*, *supra*. The petitioner claims that since it succeeded to the properties and obligations of the companies which issued the bonds, it may deduct the same amount which those companies might have deducted, while the respondent contends that so far as this petitioner is concerned it assumed payment of the bonds in full as a part of the terms under which it acquired the properties of the predecessor companies; that presumably it received full value for its assumption of such obligations and that it suffered no loss or gain by reason of bonds of the predecessor companies issued at a discount or at a premium.

It will be noted that in the present case over 40 per cent of the stock of the petitioner was issued to those who were not stockholders of the predecessor companies but bondholders or creditors. The reorganization involved a very substantial shifting of interests and under the decision of the Supreme Court in *Marr* v. *United States*, 268 U. S. 536, it would appear that for tax purposes, as well as for other purposes, regard must be had for the fact that petitioner is a new entity, separate and distinct from its predecessors, although succeeding to their properties and obligations.

The Circuit Court of Appeals in its decision laid some stress upon the fact that in that case there was, among the assets shown by the books of the predecessor, the amount set up as bond discount; that the Interstate Commerce Commission required the unextinguished discount to be carried on the balance sheet of the company and be amortized by a charge against income for the remaining life of the bonds; and that such deduction was to be allowed as a basis for rate-making and for determining the rights of the Government under the recapture clause of the Transportation Act. In the present case it appears that the discount was charged off immediately upon sale of the bonds and was not carried upon the books of the company. This treatment of this item was likewise in accordance with the regulations of the Interstate Commerce Commission, wherefrom it would appear that the Commission permits the item of discount to be either charged off immediately or over the life of the bonds. Here the first alternative was adopted for the purpose of accounting to the Interstate Commerce Commission and the petitioner is without the advantage, if any, enjoyed by the Western Maryland Railway Company by reason of its method of accounting for this item.

By reason of the large amount of stock issued by the petitioner to those who were not stockholders in the predecessor company and because of its system of accounting, the petitioner appears to be in a less favorable position to claim the deduction here involved than was

the Western Maryland Railway Company. Having in mind that appeals from our decisions lie to eleven Courts of Appeal and that one of the judges of the Court dissented in *Western Maryland Railway Co.* v. *Commissioner, supra,* and having also in mind that the grounds advanced in the prevailing opinion in that case are substantially the same as were rejected by the Supreme Court in *Marr* v. *United States, supra,* we respectfully adhere to the decision reached by us in *Western Maryland Railway Co., supra.* The action of the Commissioner in refusing to allow any deduction for amortization of discount upon bonds issued by the preceding owner of the property now owned by petitioner is approved.

The seventh issue raises the question of the right of petitioner to deduct, as a part of its ordinary and necessary expenses, payments made to railroad Young Men's Christian Associations maintaining their organizations at division points of the petitioner's railroad and furnishing its employees with eating and rooming facilities and social and recreational activities not otherwise available. The testimony is to the effect that the officers of the petitioner considered some such facilities to be necessary at division points, that they served as a means of keeping local employees satisfied at those points, and that if it had not been for the payments made by the petitioners to such Y. M. C. A.'s it would have been necessary for it to have maintained similar facilities. In like circumstances we held that such payments were a part of the ordinary and necessary expenses of operating the railroad in *Indiana Harbor Belt Railroad Co.,* 16 B. T. A. 279, and *Terminal Railroad Association of St. Louis,* 17 B. T. A. 1135. The action of the Commissioner in refusing to allow such deductions is reversed.

Next we consider the questions which arise out of the settlement made by the Director General of Railroads for the period of Federal control. Pursuant to law, the President of the United States, acting through the Director General, took possession and assumed control of the railroads and transportation facilities of the petitioner and its affiliated companies on December 28, 1917, although for purposes of economy it was subsequently agreed that settlement should be made as of midnight December 31, 1917. By an act known as "The Federal Control Act," approved March 21, 1918 (40 Stat. 451), Congress provided that the President be authorized to enter into agreements for the payment of just compensation for the use of the properties taken over, such payments to be made from time to time in reasonable installments. The act also provided that such agreements make provision for maintenance, repair, renewals and depreciation of the property at the expense of the Director General, and for the reimbursement of the United States for the cost of ad-

ditions and betterments not properly chargeable to the United States, as well as many other details not here material. On February 28, 1920, the petitioner and its subsidiaries entered into such an agreement with the Director General, acting on behalf of the President. On March 1, 1920, the railroad properties were surrendered and turned back to their owners. Thereafter negotiations were entered upon to settle the accounts between the petitioner and its affiliated companies and the Director General. The petitioner filed its claim showing an amount of $21,213,782.28 to be due it. Included in such claim were several large items concerning which there was no dispute between the parties, and other large items upon which the parties were in disagreement. The undisputed testimony is that, while in the early negotiations there was discussion of the various items making up the claim, there was no attempt to settle the claims item by item. The negotiations, starting with an offer of $6,000,000 to be paid by the Director General, resulted in a settlement of all claims upon the basis of a payment of $9,000,000 to the petitioner.

For our purpose the items which went to make up the sum total of the settlement are divisible into three classes: (1) those which are clearly income; (2) those which are clearly of a capital nature and which do not affect the computation of the taxable income; and (3) those which involve both capital and income items. In the first class are the unpaid balances due upon account of the agreed compensation for the use of the properties, adjustment of interest upon balances, and the so-called rental interest on completed additions and betterments. In the second class are the balances due upon open accounts, and the expenditures made by the Director General for additions and betterments. In the third class fall such items as road property and equipment retired, adjustments upon account of materials and supplies taken over and either not returned in kind or returned in an excessive amount, and the very substantial claim for undermaintenance of the properties.

Since the lump-sum settlement reflected both items of income and items of capital, it seems necessary that it be broken down in some manner for the purpose of determining what income the companies received or what losses they sustained. It is manifest that the situation would not be met by requiring the amount paid by the Director General to be returned as income or permitting any amount paid by the companies to be deducted as a loss. It well might be the settlement would result in a payment to the Director General because of the expenses of additions made to the railroad property in an amount greater than the agreed compensation, or because of advances made to the companies or bonded indebtedness paid on their account. On the other hand, there might be a large sum due the companies by reason of the retiring and scrapping of portions of

their property. We see no escape from the conclusion that some means must be adopted to determine what effect the settlement has upon income.

The first difficulty comes when the attempt is made to put the principle into practice. The Commissioner has been under the necessity of making the allocation in auditing the income tax returns of the railroads. It has appeared in similar cases which we have previously had before us, as it did in this case, that after the settlement was reached between the parties the Director General had placed upon his books an allocation of the settlement to the various items of the claim. This was done without consulting with the railroads and for several years they were denied any information as to the allocation made. In such previous cases, as in this case, it has appeared that the Commissioner has followed the breakdown made by the Director General and entered upon his books. In *Terminal Railroad of St. Louis, supra,* the petitioners urged that since the entries upon the books of the Director General were made *ex parte* and represented no more than the opinion of the Director General and his staff as to a proper allocation, they were not binding upon the railway and therefore might not be received in evidence to show the basis of the settlement. There the contention of the petitioner was sustained and the petitioner permitted to show by evidence what would be a proper allocation. A like contention is made here and is also sustained. There is, however, a presumption that the adjustments made by the Commissioner in determining the income of the petitioner are correct, and this presumption is not overcome by showing that the information upon which it was based was an *ex parte* statement not binding upon the taxpayer. The taxpayer may overcome the presumption by proof, but to the extent that the presumption is not overcome the determination of the Commissioner must be accepted. The Commissioner has determined that the settlement made in 1921 should be allocated as follows:

| | Due petitioner and subsidiaries | Due Government |
|---|---|---|
| Agreed compensation | $30,511,967.25 | |
| Less advances | | $21,535,652.81 |
| Rental interest on completed additions and betterments | 149,052.42 | |
| Balances on various open accounts | | 8,681,971.15 |
| Road property and equipment retired, not replaced | 796,734.48 | |
| Equipment and road property, additional | 96,256.59 | |
| Restoration of track, Lake Charles | 59,821.59 | |
| Expenditures by Director General for additions and betterments | | 5,660,604.79 |
| Additions and betterments constructed for war purposes, less salvage | 6,723.16 | |
| Leased rails and fixtures | | 67,599.28 |
| Depreciation of equipment | 2,637,198.00 | |
| Maintenance: | | |
| Way and structures | 4,532,809.00 | |
| Equipment | 6,154,912.54 | |
| Net balance due to corporation | | 9,000,000.00 |
| Total | 44,945,828.03 | 44,945,828.03 |

The record discloses that there were no differences of opinion between the Director General and the companies with respect to such items as the agreed compensation, the advances on account thereof, balances in open accounts, and expenditures made by the Director General for additions and betterments. The adjustment of interest on balances was a mathematical computation which could be made after an agreement had been reached on the other items.

The principal differences between the parties were with respect to the adjustment to be made upon account of materials and supplies and for undermaintenance of the properties. There was also the question whether the carriers were entitled to depreciation on equipment based on replacement values, and to be recompensed at replacement cost for property retired.

The evidence submitted by the petitioner does not establish that the allocation made by the Commissioner of the lump sum paid in settlement is not proper; indeed, his evidence tends to support it as reasonable.

Having arrived at some basis on which the lump sum settlement may be apportioned, it becomes necessary to consider the various items and determine how each affects the income and in what year it is to be reflected in the computation of taxable income.

The issue numbered 11 raises a question as to the year in which compensation received from the Director General for use of the property of petitioner and its affiliated corporations should be returned as income. This property was taken over by the Director General on January 1, 1918. By the terms of the Federal Control Act, the President was authorized to enter into agreements with such roads for the payment, as compensation for their use, of an annual sum not exceeding the average annual railway operating income for the three years ended June 30, 1917. The act provided for the ascertainment of such income by the Interstate Commerce Commission, and the method to be used in certain cases. Sections 2 and 3 made provision for compensation where such an agreement was not made.

It appears that in the instant case the Interstate Commerce Commission gave a certificate which tentatively fixed the annual income during the test period at $14,312,435.01, and substantially this amount was returned as income by the companies in 1918 and 1919. Subsequently, in 1920, the tentative certificate was superseded by a final certificate fixing the annual income for the test period at $14,100,227.29. The Commissioner computed the income for 1920 from this source upon the basis of the amount fixed by the final certificate. The petitioner contends that such amount should be reduced by the excess amounts returned by it as income in 1918 and 1919. This is substantially the same question which was involved in *Illinois Terminal Co.*, 5 B. T. A. 15; *New Orleans, Texas & Mexico*

*Ry. Co.*, 6 B. T. A. 436; *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Kansas City Southern Railway Co.*, 16 B. T. A. 665; and *Old Dominion Steamship Co.*, 16 B. T. A. 264; affd. 47 Fed. (2d) 148. In those cases it was pointed out that the railroads were entitled to compensation for the use of their property, that such compensation was earned and accrued in the years during which the properties were used by the Federal Government, and, on the accrual basis of reporting income, was income in those years. The action of the Commissioner in computing income in this manner is affirmed.

Issue 12. The petitioner complains of the action of the respondent in allowing it to deduct only $7,981,636.33 as the cost of materials and supplies consumed during 1920 in the maintenance of its properties. The evidence discloses that on January 1, 1918, the Director General took over the materials and supplies then on hand. These had cost the petitioner $7,981,636.33. At the close of the period of Federal control the Director General returned to the petitioner materials and supplies which the petitioner entered upon its books at $11,318,447.62. It is stipulated that these materials and supplies were used by the petitioner during the taxable year and the single question involved is whether petitioner may deduct the larger amount.

The agreement provided that at the close of Federal control the Director General should return materials and supplies equal in quantity, quality and relative usefulness to those taken over. It has been held that where the Director General returned a smaller quantity than he took over and paid for the shortage, there was taxable gain measured by the difference between the cost of the materials and supplies not returned and the amount paid therefor to the company. *Lehigh & Hudson River Railway Co.*, 13 B. T. A. 1154. It has also been held that to the extent that the materials and supplies returned equal in quantity, quality and relative usefulness those taken over, there is no taxable gain. *Indiana Harbor Belt Railroad*, 16 B. T. A. 279. This is so regardless of the fact that, because of price changes, the property returned has a greater monetary value than the equivalent property had when taken over. The property returned merely takes the place of the property previously owned. It follows as a corollary that the cost of the property returned is the cost of the property which it replaces.

The Commissioner has determined that the materials and supplies returned at the end of the period of Federal control were equal in quantity, quality and relative usefulness to those delivered to the Director General at the close of 1917, and that in the final settlement the petitioner was neither charged nor credited with any

amount upon account of either a failure to return an amount equal to those taken over or because of an excess amount returned. The petitioner takes the position that the materials and supplies returned did not equal those turned over. Both parties agreed that the material and supplies returned did not exceed those surrendered, and the proof is sufficient to establish this as a fact. We therefore have the situation where the petitioner delivers to the Director General materials and supplies which cost it $7,981,636.33, received in lieu thereof materials and supplies which it entered upon its books at a value of $11,318,447.62, which it used during the taxable year and upon account of the use of which it seeks a deduction of the increased amount. Since the materials and supplies returned did not exceed those taken over and since there is no evidence to indicate that the petitioner paid anything in the final settlement because of any excess of materials and supplies turned over, it seems clear that the cost to the petitioner of the materials and supplies used during 1920 was $7,981,636.33. It seems equally clear that the petitioner is entitled to deduct only the cost of such materials and supplies, not the increased value at which they were placed upon its books. The petitioner is in no better position than it would have been had it continued to own the materials and supplies which were taken over by the Director General and have increased their value upon its books. The determination made by the Commissioner with respect to this item is approved in principle. *Terminal Railroad Co., supra.* It has been conceded, however, that a part of such materials and supplies were not used by the petitioner in maintenance or repair work, but upon new construction and improvements. The materials and supplies so used were not charged as a part of the deduction claimed by the petitioner for maintenance and repairs and to the extent that the Commissioner assumed that they had been charged as an expense at the increased value, he confesses error. The amount by which he had understated the deduction to which the petitioner is entitled because of this error is conceded to be $380,396.48.

Issue No. 13 involves the addition to income for 1920 to $161,498.30 as an amount received by the petitioner and its affiliated companies from the Director General upon account of property retired and not replaced during the period of Federal control. The Commissioner concedes that this amount should be reduced to $96,256.59. There is some discrepancy with respect to this item between the statements appearing in the body of the notice of deficiency and in Schedule A attached ·thereto, which schedule sets out the Commissioner's determination of the manner in which the amount of the lump-sum settlement shall be allocated. Considering the whole record, however, it

seems clear that what the Commissioner proposes to include as income to the petitioner is the amount which is described in the record as "equipment retired, additional $26,149.38" and "road property retired, additional $70,107.21," a total on account of property retired, additional, of $96,256.59. The items of "equipment retired, additional" and "road property retired, additional" are described by the witnesses as amounts in excess of the cost of the property retired. It is the testimony that when property was retired an entry was made upon the books of both the corporation and the Railroad Administration and that there was no dispute as to the amount of property retired. It appears, however, that there was a dispute as to whether the Director General was required to reimburse the companies for such property at its original cost or at replacement cost. The railroad took the position that there was such an obligation to pay the replacement value and in its claim it computed the additional amount at $2,237,158.45. The petitioner concedes in its brief that if the amount here in dispute was paid to it as compensation for its property in excess of the cost thereof, such amount is taxable in some year. It urges, however, that since the Commissioner's determination as to the amount so paid is based upon the *ex parte* allocation of final settlement by the Director General, it can not be sustained, and also that in any event the amount was not income in 1920. The first contention is disposed of by what we have said above. The second contention appears to be well founded, for the situation presented falls squarely within the decision of the Board in *Lehigh & Hudson River Railway Co., supra.* There the Director General failed to return material and supplies equal to those taken over, and paid the company an amount in excess of the cost of the property not returned. There was a substantial dispute between the parties as to what adjustment, if any, should be made of the claim for shortage, which was not settled until a lump-sum settlement of all claims was made. There we held that, to the extent that the payment made exceeded the cost of the property not returned, there was income taxable in the year in which the settlement was made. The situation here is no different except that it applies to a claim for the replacement value of a different type of property. That there was a substantial dispute as to the amount is established by petitioner's claim for over $2,000,000, and the determination of the Commissioner that some $96,000 was paid in the settlement. We consider the decision in that case as controlling in this.

Issue No. 14 raises a question as to the correctness of the action of the Commissioner in adding to the taxable income for the year 1920 the amount of $38,925.90 representing interest on quarterly balances payable by the Director General to the companies. There is

no dispute between the parties that this amount accrued in 1920 and appears to have been definitely ascertained in that year. The petitioner points out in its brief that the amount of income involved is really $95,784.88, since the record shows that the amount of $38,925.90 was arrived at by deducting $56,858.98, the interest payable to the Government for one quarter of 1920, from $95,784.88, the interest due the companies from the Government for two of the other quarters of 1920. The claim is that this $95,784.88 was exempt from taxation under the provisions of the Revenue Act as interest upon an obligation of the United States. At the same time the petitioner claims the right to deduct the amount of interest which was payable from it to the Government for one of the quarters.

The question whether such interest was taxable was considered at length in *Kansas City Southern Railway Co., supra*, and our decision in that case is controlling here. The action of the Commissioner in including the amount in dispute in taxable income for 1920 is approved.

Issue No. 15 raises the question whether the Commissioner correctly reduced the operating expenses claimed by the petitioner for maintenance of way and structures and maintenance of equipment during the year 1920. The agreement under which the Director General operated the properties provided in substance that they should be maintained in such condition as would permit their return to the carriers in as good condition of maintenance as when taken over. When the petitioner came to present its claim to the Director General it took the position that the Director General had failed to fulfill this obligation and that by reason thereof it was entitled to receive $14,082,370.66. The Commissioner determined that in the lump-sum settlement the companies had been allowed $4,532,809 for undermaintenance of way and structures and $6,154,912.54 for undermaintenance of equipment. He further determined that the petitioner had expended these amounts during 1920 in restoring the properties to their previous condition of maintenance and held that the amounts so expended were not deductible. In *Terminal Railroad of St. Louis, supra*, we had before us a similar situation. There we reached the conclusion that the amount paid for undermaintenance was in reality a payment to the petitioner for its property and was not income except perhaps to the extent of the excess of payment over cost. It is by no means clear that a payment for undermaintenance would be taxable even to that extent but that question was not before us for decision either in that case or in this. In the same case we held that while the company was entitled to deduct its maintenance expenditures, ordinarily and necessarily incurred during the year, it was not entitled to deduct also expendi-

tures made to restore the undermaintenance of the Federal control period. The fact that the railroad and the Director General were not in agreement as to the amount to be allowed for undermaintenance was wholly incidental, the amount allowable as a deduction for tax purposes being the amount which was expended for maintenance as distinguished from amounts spent to restore undermaintenance of the Federal control period.[1] In the case cited the proof was insufficient to show that the amount allowed as maintenance expense by the Commissioner was not proper and we found it necessary to affirm his action. In the case now before us, the proof establishes that the best that the petitioner could do in 1920, due to shortage in labor, the difficulty of securing materials and its financial condition, was to keep its road in substantially as good repair as when received back from the Director General. The record leaves no doubt that the undermaintenance which occurred during the period of Federal control was not made up to any extent during 1920. In such circumstances the Commissioner was in error in determining that any part of the amount expended by the petitioner for maintenance was, in fact, expended to make good undermaintenance.

The proof upon this issue is very lengthy and we do not propose to discuss it in detail. The petitioner produced as witnesses the men whose duty it was to oversee the maintenance of the properties, men who were thoroughly familiar with the petitioner's properties at the time they were taken over, at the time returned, and during all of 1920. Their testimony was in substance that the average condition of maintenance of the properties at the close of 1920 was no better than on March 1, 1920. In detail they explained what was done and why more was not done. Counsel for the Commissioner points out that their testimony discloses that many of the worst conditions existing when the roads were returned were corrected as soon as possible. While this was done, the testimony is that it was at the expense of less pressing items of current maintenance. Amounts available for maintenance were expended where most needed. Primary lines were improved while the secondary lines suffered still further undermaintenance. It is quite evident that the question can not be solved merely by looking at particular items of maintenance or undermaintenance. The real question is whether the average condition of maintenance was improved during 1920. The testimony of these witnesses was supported by detailed statistical studies which disclosed that after adjusting the purchasing power of the dollar in terms of labor and materials and giving effect to the increase in traffic, the amount expended for maintenance in 1920 was practically

---

[1] An amount spent for maintenance is deductible as an ordinary and necessary expense of the business. Amounts spent to improve the property, to replace or restore property destroyed or damaged and for the destruction or damage of which taxpayer has been or is to be recompensed by another can not be so classified.

the same as the average amount expended for the period 1910 to 1920 and was less than the average amount expended in the years designated in the Federal Control Act as the test period. The principal attack which the Commissioner makes upon this supporting evidence is made upon the use by the witness of the "All Commodity Price Index" as prepared by the United States Department of Labor for the purpose of determining the relative cost of materials and supplies used in maintenance throughout the years. The propriety of using the index in the case of this taxpayer has been supported to some extent by comparative cost data taken from purchases made by the petitioner. Comparative labor costs are derived from the records of the petitioner's own costs. While there are some factors involved which are not susceptible of exact valuation, we can accept these statistical studies as confirmatory of the opinions expressed by those who had personal knowledge of the condition of the property. The same is true of the testimony of an employee of the Interstate Commerce Commission who made a study for that Commission of the expenditures of the petitioner during the three years ended June 30, 1917, and during the year 1920, upon the basis of which he expressed an opinion as to the factor to be used in converting expenditures made during the earlier years into an amount which would represent the equivalent in labor and materials in the later years. Perhaps the strongest confirmation of the opinion expressed by those in charge of maintenance is evidence which shows that the total number of hours of labor devoted to maintenance in 1920, the tonnage of new rails laid, and the number of crossties laid were all less than the average of a ten-year period although traffic had increased in 1920. Rails and crossties represent the largest single item of materials and supplies used in maintenance work. It is upon the testimony of those in charge of maintenance work during the taxable years, based upon their personal knowledge of the property and its physical condition, supported by the other evidence mentioned above, that we reach our conclusion that no part of the expenditures made during 1920 is to be accounted for as made to overcome undermaintenance of the Federal control period. The action of the Commissioner in refusing to allow as a deduction the full amount expended for maintenance of way and structures and maintenance of equipment is reversed.

To dispose of the issue arising out of the Federal control settlement, we next take up for discussion the issues numbered 32 and 33. The first of these is the claim of the petitioner that it sustained uncompensated losses as result of Federal control, which it is entitled to deduct in 1920. The petitioner arrives at the conclusion that it sustained a loss computed as follows:

Amount of its claim as shown in findings of fact_____ $35, 625, 891. 79
Add: Rental interest on computed additions and betterments__    149, 052. 42
                                                              _____
  Total_____    35, 774, 944. 21
Amounts admitted to be due to Director General as shown
  in its claim (the same amount was used by the Commissioner
  in his set up of the settlement)_____    14, 412, 109. 51
                                                              _____
Balance due petitioner_____    21, 362, 834. 70
Amount paid in settlement_____     9, 000, 000. 00
                                                              _____
  Loss claimed as a deduction_____    12, 362, 834. 70

The basis for the computation of a deductible loss, for income tax purposes is the cost or March 1, 1913, value of the property. Where property is disposed of the loss is the difference between the amount realized and such basis.

A substantial part of the claim filed with the Director General is based upon the claim that the railroad is entitled to be repaid at replacement values. As we understand the situation there was no substantial dispute as to the right of petitioner to be compensated for depreciation of its equipment upon the basis of cost or to be paid on that basis for property retired. Its claim includes these amounts and also includes, as separate items, additional amounts based upon the replacement values of equipment and of property retired. There could be no loss for tax purposes because the Director General failed to pay such claims. These two total $3,364,867.80. The claim for undermaintenance of the property, amounting to $14,082,370.66, was also based in substantial part upon replacement costs. The item of interest on balances, set out in the claim at $1,600,804.59, was a claim for an item which, if paid, would be income. Failure to pay would not be a deductible loss for tax purposes. The taxpayer would lose nothing which it had previously had; it would simply fail to collect income, and would be required to report only the amount collected. It is thus demonstrated that if we take the settlement as a whole and compare the amount received with that portion of the claim which is shown to be based upon costs to the petitioner, no deductible loss is established. If, however, we accept the breakdown of the settlement made by the Commissioner, as we must do in the absence of evidence that it is incorrect, there is some evidence that the petitioner did in fact sustain a loss in the settlement made upon materials and supplies. While the Commissioner has treated the materials and supplies returned as being the equivalent of those taken over, it is doubtful if this was so in fact. If those returned were less than those taken and petitioner was not compensated for the cost of those not returned, it sustained a loss in the amount of such cost. Such a loss would be deductible.

It appears, however, that the petitioner has already been permitted to deduct as a part of its expenses of maintenance the entire cost of the materials turned over to the Director General, on the assumption that they were all returned in kind, and were to be expensed at cost. If in fact there was a shortage in the materials returned, for which a loss should be allowed, the Commissioner was in error in allowing the petitioner to deduct, as cost of such materials when used, the cost of all materials turned over to the Director General. The petitioner could claim only the amount which represented the cost to it of materials and supplies equal to those which it received back and used. The amount of the loss would be the cost of the materials delivered to the Director General and not returned in kind. The cost of materials used would have to be reduced by the same amount. The taxable income would remain unchanged. The petitioner has been allowed as a deduction the cost of the materials and supplies turned over and is in no position to claim a part of the same item as a loss.

We do not think it necessary to pass upon the question whether, if there had been any loss, it would accrue or be incurred in 1920 or in 1921.

Issue No. 33. The agreement of February 28, 1920, provided that costs of additions and betterments should be paid for by the railroad companies and that, in addition to the agreed compensation, the railways should be paid " a reasonable rate of interest," to be fixed by the Director General, upon the amount of such costs. The rate of interest was not finally determined until 1920. The amount so to be paid is described throughout the record by the term " rental interest." .It is the present position of the Commissioner that, since the amount of such rental interest could not be determined until the rate was fixed in 1920, the entire amount, whether accrued for 1920 or for prior years, is taxable as 1920 income. In his amended answer the Commissioner prays that the income for 1920, as determined by him, be increased accordingly. The petitioner admits that it is liable to return as income for 1920 the rental interest computed for the months of January and February, 1920. Its counsel points out that the contention now made by the Commissioner, that the rental interest which was earned in 1918 and 1919 should be returned as 1920 income, is inconsistent with the position taken by the Commissioner with respect to issue No. 11. Counsel urge that the Commissioner can not be right as to both and contends that the error lies in the position of the Commissioner with respect to issue No. 11. We have already held that the action of the Commissioner in respect of such issue should be affirmed, basing our conclusion upon a number of prior decisions of the Board and the Circuit Court.

The contention of the petitioner is that in both cases the amount of compensation to be paid for the use of its property was uncertain until finally determined. The line of distinction between such cases as *United States* v. *Anderson*, 269 U. S. 422; *Fawcus Machine Co.* v. *United States*, 282 U. S. 375; *Commissioner* v. *Old Dominion Steamship Co.*, *supra*, and the cases cited under issue No. 11, on the one hand, and *Lucas* v. *American Code Co.*, 280 U. S. 445, and *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, on the other, is not, and perhaps can not be, clearly marked. We believe that it can be properly stated as a general rule, which may have its exceptions, that where the item of income or deduction is of an annually recurring nature such as rent, interest, or taxes, and there is no dispute as to the liability therefor, the item must be accrued in the year in which earned or, if an expense, in the year in which incurred, even though the amount to be accrued may not be definitely ascertainable before the close of the taxable year. The statute provides a period of limitation within which adjustment may be made to reflect the correct amount as subsequently ascertained and a method by which such period may be extended when necessary. To permit annually recurring income or expenses of a business to be accumulated would only serve to distort the annual income. The income here involved was earned from the use of the petitioner's property. The payment was provided for by section 4 of the Federal Control Act and was to be added to the amount of adjusted compensation, payable in installments from time to time. We are of the opinion that the amount should be accrued in each of the years in which it was earned and that there should be added to the income of the petitioner for 1920 the amount of $21,058.

Under issue No. 16 the petitioner alleges that the Commissioner committed error in including in its income amounts collected by it from assets standing upon the books of the predecessor companies and not entered upon its books at the time of the reorganization. The items so included are set out in our findings of fact. The petitioner admits that the Commissioner correctly included the second item and concedes as to the third that the record fails to show the cost or March 1, 1913, value of the property. The testimony with respect to the first item is that it represents amounts collected upon accounts due to predecessors of petitioner, which accounts were not transferred to the books of petitioner because they were uncertain as to collectibility. The basis of the petitioner's contention is that these were all items which entered into the income of the predecessor companies, that the petitioner stands in the shoes of its predecessors and should not be required to return these collections as income. The circumstances with respect to reorganization are set out in connec-

tion with issue No. 6. The respondent points out that the evidence with respect to such items is very indefinite, that even if petitioner's contention is sound there is no showing of the cost to the predecessor companies and also urges, as he did under issue No. 6, that the petitioner was a new corporation for tax purposes, that it acquired the assets of the predecessors by purchase and has not shown the cost of such assets to it. The record is insufficient to permit us to disturb the action of the Commissioner.

Issue No. 17 involves the right of a subsidiary company, Western Coal & Mining Company, to deduct $500 paid by it to the Mount Carmel Hospital in the Pittsburg field where the properties of the mining company were located. That company was required by the Workmen's Compensation Act to provide hospital care for its injured employees. Without the facilities offered by the hospital it would have been under the necessity of providing such facilities at its own expense. The payment was made, not from the standpoint of philanthropy, but rather of self interest. We are of the opinion that in the circumstances the payment is properly treated by the mining company as a part of its ordinary and necessary expenses and not as a charitable contribution. The deduction claimed should be allowed. *Franklin Mills*, 7 B. T. A. 1290; *Sugarland Industries*, 15 B. T. A. 1265; *Corning Glass Works* v. *Commissioner*, 37 Fed. (2d) 798.

Issue No. 30 raises the question whether amounts certified by the Interstate Commerce Commission as due to the petitioner and its affiliated companies under the guaranty provisions of section 209 of the Transportation Act are taxable as income in 1920. This question was before the Board in *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233, decided this day. Our decision there is controlling in this case and the action of the Commissioner in including the guaranty payment as income is affirmed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*