INTERNATIONAL-GREAT NORTHERN RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25520.    Promulgated November 11, 1931.

*J. L. Lockett, Esq.,* and *Richard H. Wilmer, Esq.,* for the petitioner.

*J. T. Haslam, Esq.,* for the respondent.

### OPINION.

SMITH: This a proceeding for the redetermination of petitioner's liability to income tax under section 280 of the Revenue Act of 1926 for income and profits tax due from the International & Great Northern Railway Company, James A. Baker, Receiver, for the calendar year 1920, in the amount of $460,608.90. The petitioner admits that it is a transferee of the assets of the International & Great Northern Railway Company, James A. Baker, Receiver, and is liable for any income and profits tax which may be found to be due from the transferor for the calendar year 1920.

The petition alleges that the respondent erred in many respects in the computation of the alleged deficiency due from the transferor: (1) In his computation of the net loss for the year 1919 allowed as a deduction in computing the net income for the year 1920, in accordance with section 204 (b) of the Revenue Act of 1918; (2) in his computation of invested capital for the year 1920; and (3) in his computation of taxable income for the year 1920.

At the hearing of this proceeding on May 25, 1931, after permission first granted by the Board, the respondent amended his answer to allege that he failed to include in taxable income for the year 1920 certain items of income applicable to that year, and thereby sought to increase the deficiency set forth in the deficiency letter dated January 25, 1927.

By stipulation filed with the Board at the hearing, the issues stated in paragraph four of the petition, described below, were disposed of as indicated:

Conceded by respondent:

(c) Failure to allow deduction of amortization of bond discount in the amount of $1,798.12 for each of the years 1919 and 1920.

(e) Erroneous inclusion in taxable income of donations in the amount of $1,133.97 for 1919, and $20,048.38 for 1920.

(f) Erroneous disallowance in 1919 of a deduction of $144.60, not in fact deducted, for tax on tax-free covenant bonds.

(g) Failure to allow a deduction of $530.48 from 1919 income for amortization of bond discount.

(h) Erroneous inclusion in 1919 income of interest in the amount of $43,922.01.

(i) Failure to allow a deduction in 1920 of $1,220,905.85 from income accrued under the provisions of section 209, Transportation Act, 1920.

(l) Failure to allow a deduction in 1920 for amortization of bond discount in the amount of $767.58.

(m) Failure to allow a deduction in 1920 of Trustee expenses in the amount of $67.93.

(o) Error in computing the tax liability at the rate of 10% for the entire year 1920, instead of at the rate of 8% on income accrued for the months of January and February and at 10% on income accrued for the period from March 1 to December 31.

Issues withdrawn or conceded by petitioner:

(n) Alleged error in reducing claimed deduction for operating expenses of the year 1920, in the amount of $22,513.49, for Transportation for investment credit.

(q) (1) and (2) Alleged error in failing to include in invested capital of the year 1920, interim stock certificates in the amount of $5,078,000, and cash, alleged to have been paid for preferred stock, in the amount of $1,600,000.

(r) Constitutionality of Section 280 of the Revenue Act of 1926.

(s) Alleged error in holding that the petitioner is the transferee of International & Great Northern Railway Company, James A. Baker, Receiver.

Issue raised by respondent and conceded by the petitioner:

Failure to include interest in the amount of $933.33 in taxable income of 1920.

The remaining issues raised in this proceeding by the petitioner, and by the respondent in amendment to his answer, which are presented to the Board for decision are as follows:

(a) Is the sum of $404,000, paid by the Director General of Railroads as additional compensation, taxable in 1920, or in 1918 and 1919?

(b) Is the amount of $71,749.06, determined in 1919 to be due to the petitioner for services rendered in 1916 and 1917, for transporting United States mail, taxable income of 1919, or of 1916 and 1917?

(d) May the petitioner deduct payments made to the Association of Railway Executives, in the amount of $871.84 in each of the years 1919 and 1920, as part of its ordinary and necessary expenses?

(dd) Is the amount received by the petitioner under and by virtue of Section 209, Transportation Act, 1920, taxable income?

(j) Did the respondent commit error by his adjustment of 1920 taxable income with respect to material and supplies?

(k) Did the respondent commit error by his adjustment of 1920 taxable income with respect to undermaintenance?

(p) Is income earned by a receiver from the operation of the properties held by him as receiver, subject to excess-profits tax under the Revenue Act of 1918?

(q) (3) Should invested capital for 1920 include $404,000 additional compensation paid by the Director General of Railroads?

(q) (4) Should invested capital for 1920 include $38,349.55 alleged to be the balance of a total of $106,478 unamortized discount on bonds?

Issue raised by respondent:

1. Is the sum of $55,781.56, paid by the Director General of Railroads for interest on cost of additions and betterments, taxable in 1920, or in 1918, 1919, and 1920?

The petitioner is a Texas corporation which maintains its principal office at Palestine. On or about November 30, 1922, the petitioner acquired all of the assets of the International & Great Northern Railway Company, James A. Baker, Receiver.

During the year 1917 the properties and assets of the International & Great Northern Railway Company were in the custody and control and being operated by James A. Baker, as receiver appointed and acting under orders of the United States District Court for the Southern District of Texas. James A. Baker, as such receiver, is hereinafter called the Receiver. Except as taken over and operated by the President of the United States of America through his Director General of Railroads, said properties and assets thereafter continued under the custody, control, management, and operation of the Receiver to and including November 30, 1922, at which point of time the said Receiver, under orders of said court, surrendered and delivered to petitioner, International-Great Northern Railroad Company, all of said properties and assets and was discharged from further liability except in respect of the suit then pending by said Receiver against the Pierce Oil Corporation for damages for breach of contract, which suit was continued under the control of the Receiver for the benefit of the petitioner to the extent of any portion of any recovery that might be had in said suit and that might be allocated by the court to the period subsequent to the guaranty period.

During all of the period involved herein the books of account of the Receiver were kept on the accrual basis, as prescribed by the Interstate Commerce Commission, and the income-tax returns filed by the Receiver were prepared on the accrual basis.

By proclamation dated December 26, 1917, the President of the United States, acting under the powers conferred on him by the Constitution and laws of the United States, by the joint resolutions of the Senate and House of Representatives bearing dates April 6 and December 7, 1917, respectively, and particularly under the powers

conferred by section 1 of the Act of Congress approved August 29, 1916, entitled "An Act Making Appropriations for the Support of the Army for the Fiscal Year ending June 30, 1917, and for Other Purposes," took possession and assumed control at noon on December 28, 1917, of the railroad and transportation system of the Receiver, and directed that the possession, control, operation, and utilization of the property thus taken should be exercised by and through the Director General of Railroads.

The Act of Congress approved March 21, 1918, known as the Federal Control Act, authorized the President to enter into agreements with the companies whose properties were taken over for the maintenance and upkeep thereof during the period of Federal control, for the determination of the rights and obligations of the parties to the agreement arising from or out of Federal control, including the compensation to be received or guaranteed, and for other purposes, as in said act more fully set out.

The Congress of the United States, by Act approved February 28, 1920, entitled " The Transportation Act, 1920," directed that " Federal control shall terminate at 12.01 a. m., March 1, 1920; and the President shall then relinquish possession and control of all railroads and systems of transportation then under Federal control and cease the use and operation thereof." The act further authorized the President to make final settlement of all matters arising out of Federal control.

During the month of May, 1921, the Receiver presented to the Director General his statement of the reciprocal claims of the parties under the provisions of the Federal Control Act and the provisions of the Transportation Act, 1920, and the provisions of the contract hereinbefore referred to between the Receiver and the Director General, in which statement was set forth the Receiver's contentions as to the amounts due by the parties to each other in respect of material and supplies, undermaintenance and other matters not relevant to this proceeding, as well as the amount of compensation due to the Receiver for the use of said property during the period of Federal control, with credits as contended for by the Receiver. This statement showed a net balance due the Receiver from the Director General of $3,899,067.50. About May 23, 1921, following presentation of said claim, a conference was had between the Receiver and certain of his officers and agents, including his auditor, and conferees representing the Director General. At that conference the representatives of the Director General stated that the Director General held a claim against the Receiver in a substantial sum over and above the sum claimed by the Receiver, but on the request of the Receiver for an itemized statement thereof the representatives of the Director

General declined to furnish it, on the ground that to do so would violate the instructions of the Director General, and stated that the difference in their claims and that of the Receiver would only be discussed in general terms, as any settlement that might be reached would be on a lump-sum basis without any itemized statement of account in support thereof. With this information before the Receiver, the negotiations in an effort to reach settlement continued until May 25, 1921, on which date the conference was terminated and the representatives of the Director General stated that they would render a decision on May 31, 1921. On May 31, 1921, the Receiver with his auditor met the representatives of the Director General, who stated that after giving full consideration to all matters growing out of the hearing they had reached a conclusion and made a lump-sum offer of settlement. That offer of the Director General was not accepted, and on March 4, 1922, the Receiver presented to the Director General a revised claim showing a net balance due the Receiver in the sum of $5,316,564.96. In April, 1922, the Receiver, with his auditor, again met the representatives of the Director General for the purpose of conference in an effort to reach settlement of the Federal control period accounts and claims. As soon as the conference convened the representatives of the Director General announced to the Receiver that the Director General was willing to pay a lump sum of $100,000 in full settlement of all claims and accounts, which offer was in excess of the previous offer which had been made by the Director General on May 31, 1921. This offer was accepted and settlement made upon that basis. At no time was the Receiver himself or through his officers or representatives informed as to the items of debit and/or credit upon the basis of which the Director General supported the lump-sum settlement of $100,000; each and every suggestion or request for information in regard to several and specific items was met with refusal to give such information. In about the year 1927, the petitioner finally secured from the office of the Director General a statement prepared by the Director General purporting to show the items of debits and/or credits upon which the aforesaid settlement had been predicated. This was the first time that the petitioner or the Receiver ever was cognizant of the various items of debits and/or credits (involved in the issues presented in this proceeding in respect to material and supplies and undermaintenance) shown in the records of the Director General's office in support of said settlement. Neither the books of the Receiver nor of the petitioner show the entries of the items found in the said statement in the Director General's office and referred to in the preceding sentence except that said books do show the inventories of material and supplies on hand at December 31, 1917, and February 29, 1920.

For convenience of treatment, the facts and arguments relative to each of the issues remaining in controversy are set forth together.

### Issue (a)—Additional Compensation

On January 7, 1919, the Interstate Commerce Commission, in accordance with the provisions of section 1 of the Federal Control Act, tentatively certified to the President of the United States that the average annual railway operating income of the Receiver was $1,394,945.98. The Receiver filed a protest with the Interstate Commerce Commission, claiming that the said certificate should have named a greater amount, and declined to accept the above stated amount of $1,394,945.98 as annual compensation for use of the railroad properties. The controversy between the Receiver and the Director General of Railroads with respect thereto continued until February 28, 1920, when the Receiver and the Director General agreed that the annual compensation for the use of the said properties during the period of Federal control should be $202,000 in excess of whatever amount should be named by the Interstate Commerce Commission in its final certificate. The Interstate Commerce Commission rendered its final certificate to the President on March 27, 1922, and named therein the sum of $1,375,529.77, as the average annual railway operating income of the Receiver, but the Receiver was informed by the Interstate Commerce Commission not later than May 13, 1920, what amount would be shown in the final certificate.

The "Classification of Income, Profit and Loss, and General Balance Sheet Accounts," promulgated by the Interstate Commerce Commission, effective July 1, 1914, and which is still in effect, includes an account styled "Income from lease of road," the text of which reads in part as follows:

This account shall include the entire amount receivable accrued for the exclusive use of road, tracks, or bridges (including equipment or other railway property covered by the contract) * * *

The general instructions, which form a part of said classification, include the following:

2. *Unaudited Items Affecting Operating Accounts.*—When for any cause the amount of any item affecting operating revenues or operating expenses cannot be accurately determined in time for inclusion in the accounts of the month in which the transaction occurs, the amount of the item shall be estimated and in such form charged or credited to operating accounts and credited to balance-sheet account No. 778, "Other unadjusted credits," or charged to balance-sheet account No. 727, "Other unadjusted debits," as may be appropriate, the necessary adjustments being made later when the item is audited. The carrier is not required to anticipate minor items which would not appreciably affect the operating accounts.

3. Delayed Items. When no provision has been made through entries in the accounts of these classifications for anticipating delayed items chargeable or creditable to the accounts herein, and the amount of any such item is relatively so large that its inclusion in the accounts for a single year would seriously distort those accounts, the carrier, if so authorized upon application to the Interstate Commerce Commission shall distribute to Profit and Loss so much of the amount as may be authorized. * * *

When the amount of a delayed item is relatively so large that its inclusion in the accounts for a single month will seriously distort those accounts it may be distributed in equal monthly charges for the remaining months of the current fiscal year.

*Delayed Items* are items representing transactions which occurred before the current fiscal year.

The Interstate Commerce Commission has not issued any order modifying the above quoted text.

Under date of March 1, 1919, C. A. Prouty, Director of Division of Accounting, United States Railroad Administration, issued Accounting Circular No. 79.

For each of the years 1918 and 1919, the Receiver entered on his books of accounts, in the account " Income from lease of road," the sum of $1,394,945.98 (the amount stated in the tentative certificate of the Interstate Commerce Commission), as compensation due from the Director General of Railroads, and so reported to the Interstate Commerce Commission for the said years.

The Receiver filed his income and profits-tax returns for the years 1918 and 1919, and included in gross income for each of said years the said sum of $1,394,945.98 as the amount of the standard return.

On March 5, 1921, the Receiver filed amended income and profits-tax returns for the years 1918 and 1919 in which there was included in gross income for each of said years $1,577,529.77, being the sum of the standard return as fixed in the final certificate, and $202,000 additional compensation provided for in the aforesaid agreement of February 28, 1920. The Receiver's original return for 1918 showed a net loss of $477,614.87; his amended return for that year showed a net loss of $131,546.48. The Receiver had no taxable income for the year 1918, but sustained a net loss for that year. The Receiver's original return for 1919 showed a net loss of $335,248.28; his amended return for that year showed a net loss of $123,432.18.

In his audit of the amended returns for the years 1918 and 1919, the Commissioner excluded from gross income of each of said years the amount of $202,000, or the said additional allowance.

During the year 1920, the Receiver entered on his books of account in the account " Income from lease of road," the sum of $628,089.20 and so reported to the Interstate Commerce Commission in his report for the year 1920. The said $628,089.20 consisted of:

One-sixth of $1,577,529.77_____ $262, 921. 62

Difference between $1,577,529.77, amount of final certificate, and $1,394,945.98, amount of tentative certificate which latter amount had been reported as taxable income in:

1918_____ 182, 583. 79

1919_____ 182, 583. 79

.Total_____ 628, 089. 20

The Receiver's report to the Interstate Commerce Commission above referred to carried the following explanatory note in reference to said sum of $628,089.20, to wit:

The above covers the months of January and February 1920, plus adjustment for the years 1918 and 1919 to basis of amount covered in contract with the United States Railroad Administration. Compensation per year as per contract $1,577,529.77.

In his income and profits-tax return for the year 1920, the Receiver included in gross income for that year $262,921.62, being one-sixth of $1,577,529.77, which is the sum of $1,375,529.77 (the average annual operating income finally certified to the President by the Interstate Commerce Commission) and $202,000 (the additional annual compensation allowed by the Director General of Railroads).

In determining the deficiency involved in this proceeding, the Commissioner increased the taxable income reported for the year 1920 by adding thereto the sum of $404,000, which is the additional compensation (for 1918 and 1919) stated in the agreement dated February 28, 1920.

The parties have stipulated that should the Board determine that the $404,000 does not constitute taxable income for the year 1920, the net loss for the year 1919, as heretofore computed by the Commissioner, should be decreased by $202,000, and that invested capital for the year 1920, as heretofore computed by the Commissioner as being $5,846,055.88, should be increased by $404,000.

Upon this point the respondent contends that the petitioner's books of account do not reflect this item of $404,000 as income of 1918 and 1919; that it was not an accruable item of those years; that the additional compensation was fixed by the agreement of February 28, 1920; and that therefore it was an accrual of that year. In support of this proposition the respondent cites *Lucas* v. *Ox Fibre Brush Co.*, 281 U. S. 115, in which the facts were that the taxpayer voted extra compensation in 1920 to certain officers of the company for services which were actually rendered in prior years. The taxpayer kept its books of account and made its returns on the accrual basis. The Commissioner took the position that, since the services were not actually rendered in 1920, an allowance of a deduction in that year would not clearly reflect income. The Supreme

Court, after setting out the provisions of section 212 (b) of the Revenue Act of 1918, which refers to computing income upon such basis and in such manner as in the opinion of the Commissioner clearly reflects income, said:

This section relates to the method of accounting; the Commissioner may make the computation on a basis that does clearly reflect the income, if the method employed by the taxpayer does not. But this section does not justify the Commissioner in allocating to previous years a reasonable allowance as compensation for services actually rendered, when the compensation was properly paid during the taxable year and the obligation to pay was incurred during that year and not previously. In the present instance, the expense could not be attributed to earlier years, for it was neither paid nor incurred in those years. There was no earlier accrual of liability. It was deductible in the year 1920 or not at all.

The respondent also cites *Lucas* v. *American Code Co.*, 280 U. S. 445; *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359; and numerous decisions, including *Missouri Pacific Railroad Co.*, 22 B. T. A. 267; *Peninsula Shipbuilding Co.*, 9 B. T. A. 189; *Great Northern Railway Co.*, 8 B. T. A. 225; and *Buffalo Union Furnace Co.*, 23 B. T. A. 439, all to the general effect that income and expenses accrue when the right to receive the income or the obligation to make the payment definitely arises.

The petitioner, on the other hand, relies upon the following decisions: *Illinois Terminal Co.*, 5 B. T. A. 15; *New Orleans, Texas & Mexico Railway Co.*, 6 B. T. A. 436; *Great Northern Railway Co.*, supra; *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Western Maryland Railway Co.*, 12 B. T. A. 889; *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988; *Old Dominion Steamship Co.*, 16 B. T. A. 264; affd., 47 Fed. (2d) 148; *Kansas City Southern Railway Co.*, 16 B. T. A. 665; *Midland Valley Railroad Co.*, 19 B. T. A. 423; *Missouri Pacific Railroad Co.*, supra; and *Kansas City Southern Railway Co.*, 22 B. T. A. 949, in which it was held that transportation companies receiving from the Director General of Railroads compensation for the period of Federal control are required to return such income for the several accounting years contained within the period of Federal control, regardless of when such additional compensation was determined and regardless of how it was reported upon the taxpayer's books of account. In the instant proceeding there can be no question but that the additional compensation paid to the petitioner was for the use of its properties during the period of Federal control. The question of the amount to be paid was not settled until 1920. The facts in this case, however, are not substantially different from those which obtained in several of the cases cited above and relied upon by the petitioner. We see no

ground for reaching a different conclusion in this petition from that reached in the above cited cases. The contentions of the petitioner upon this point are therefore sustained.

### *Issue (b)—Mail Pay*

The " Classification of Operating Revenues and Operating Expenses of Steam Roads," promulgated by the Interstate Commerce Commission, which became effective July 1, 1914, and remained in effect during all of the period involved herein, contains a revenue account styled " Mail," the text of which reads in part as follows:

This account shall include the revenue from the transportation of mail at established rates for specified routes; from the use of railway post-office cars when in carrier's service transporting mails; from the use of special mail facilities; and from bonuses for special mail transportation. * * *

The Interstate Commerce Commission has not issued any order modifying the text of the revenue account " Mail," or of the General Instructions (set forth under Issue (a)), to permit any other basis of accrual.

The railway operating revenue of the Receiver for the years ended December 31, 1916, and 1917, was $10,766,945 and $12,588,224, respectively.

Section 5 of the Act of Congress approved July 28, 1916 (39 Stat. 421, 425), relates to the compensation to railroad companies for handling and transporting mail, and reads in part as follows:

That the Postmaster General is authorized and directed to readjust the compensation to be paid to railroad companies from and after the thirtieth of June, nineteen hundred and sixteen, or as soon thereafter as may be practicable, for the transportation and handling of the mails and furnishing facilities and services in connection therewith upon the conditions and at the rates hereinafter provided.

The rates of payment, which the Postmaster General is authorized to make for each of the several classes of service, are enumerated in the act. The act further provides:

Pending the decision of the Interstate Commerce Commission, as hereinafter provided for, the existing method and rates of railway mail pay shall remain in effect, except on such routes or systems as the Postmaster General shall select, and to the extent he may find it practicable and necessary to place upon the space system of pay in the manner and at the rates provided in this section, with the consent and approval of the Interstate Commerce Commission, in order to properly present to the Interstate Commerce Commission the matters hereinafter referred thereto: *Provided*, That if the final decision of the Interstate Commerce Commission shall be adverse to the space system, and if the rates established by it under whatever method or system is adopted shall be greater or less than the rates under this section, the Postmaster General shall readjust the compensation of the carriers on such selected routes and systems

in accordance therewith, from the dates on which the rates named in this section became effective.

During the years 1916 and 1917 the Receiver entered on his books in the revenue account "Mail," and reported as taxable income of those years, the amount due to him for transporting mail computed at the rates allowed by the Postmaster General acting pursuant to the provisions of the said Act of Congress. On December 23, 1919, the Interstate Commerce Commission made a report setting out the basis on which the petitioner and other roads were entitled to certain additional compensation for transporting the United States mails. As a result of this report, there was paid in the year 1920, to the petitioner, the sum of $71,749.06, additional compensation for the period June 30, 1916, to December 31, 1917. The award of the Interstate Commerce Commission was rendered in *Railway Mail Pay*, 56 I. C. C. 1, pursuant to the provisions of sections 5 and 6 of said Act of July 28, 1916, Post Office Department Appropriation, 39 Stat. 412, 425.

No part of the said $71,749.06 was included in taxable income for any of the years 1916 to 1919, inclusive. The additional $71,749.06 was received by the Receiver in 1920, was included by the Receiver in his income accounts for 1920, and was reported as taxable income in his return filed for the year 1920. The Commissioner reduced the taxable income reported for the year 1920 by eliminating therefrom the said $71,749.06, and added that amount to the income of the Receiver for the year 1919, thereby reducing to that extent the net loss reported by the Receiver for the year 1919.

The parties have stipulated that, should the Board determine that the said $71,749.06 does not constitute income for the taxable year 1919, the net loss for 1919, as heretofore computed by the Commissioner, shall be increased by $71,749.06.

Although the Receiver reported the $71,749.06 as income of 1920 and the respondent has excluded the amount from the income of 1920 and included it as income of 1919, the petitioner contends, in accordance with *Western Maryland Railway Co.*, 12 B. T. A. 889; *Kansas City Southern Railway Co.*, 16 B. T. A. 665; and *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233, that the amount did not constitute income for either of the years 1919 and 1920, but was income for the years 1916 and 1917.

The question presented is, When did the $71,749.06 accrue to the taxpayer?

The only compensation which the carriers had assurance of receiving for the transportation of mail was that named in the Act of Congress and which was the amount accrued upon the petitioner's books prior to 1920, in accordance with the accounting requirements of the

Interstate Commerce Commission. The income-tax returns for years prior to 1920 were made upon the accrual basis and we think correctly made when made in accordance with the books of account. That no possible basis existed for any other accrual is plainly indicated by the report of the Interstate Commerce Commission in Docket 9200, Railway Mail Pay, 56 I. C. C. 1. That a dispute existed can not be doubted since the Post Office Department and the railroads contended for bases of compensation widely different (56 I. C. C. 1).

The Interstate Commerce Commission's classification provides that the revenue account " Mail " shall include revenue *at established rates* for transporting mail; that the carrier is not required to anticipate minor items which would not appreciably affect the operating accounts; and that delayed items are those representing transactions which occurred before the current fiscal year.

In *Richmond, Fredericksburg & Potomac Railroad Co.*, decided April 7, 1931, and reported in 170 I. C. C. 451, the Interstate Commerce Commission, at pages 513 and 514, states:

*Delayed receipts not accrued when earned.*—Included in net railway operating income as above stated is an item of $40,905.45, representing additional compensation for transportation of mail in 1916 and 1917 received in 1921, pursuant to our order of December 23, 1919, in Railway Mail Pay, 56 I. C. C. 1. The item was credited, in conformity with our accounting regulations, in the year when received and the respondent contends that it should be eliminated from the current income stated.

This item falls in the classification of delayed items, the accounting for which is prescribed in our Classification of Operating Revenues and Operating Expenses of Steam Roads. It is therein provided that when no provision has been made by the carrier through entries in the accounts for anticipated delayed items, they must be included in the current accounts unless they are relatively so large that to do so would seriously distort those accounts, in which event the carrier, if so authorized upon application to us, shall distribute to profit and loss so much of the amount as may be authorized.

The carrier made no such application, thus apparently recognizing that the item was not of sufficient amount to result in distortion of the current accounts.

This same question of allocating back to the period 1916–1917 the increases in mail pay upon our decision in the case above cited, was before us in connection with the computation of railway operating income for standard return purposes, and on the 18th day of March, 1920, we decided that such applications for authority to depart from the prescribed accounting regulations would not be granted. Respondent's contention is denied and no modification of net railway operating income for the year 1921 will be made on this account.

In *Western Maryland Railway Co.*, *supra*, one of the questions before us was whether additional compensation paid under the provisions of section 5 of the Act of July 28, 1916, by the Government to petitioner in the year 1920, for services rendered in transporting United States mail in the years 1916 and 1917, was taxable income for the year 1919, as contended by the Commissioner. We held that it was not and further commented that the income was earned in

the years 1916 and 1917, and, if the petitioner was on the accrual basis, as we assumed, the payments received in 1920 should have been allocated to and returned for the years in which they were earned by it, to wit, 1916 and 1917. In *Kansas City Southern Railway Co.*, *supra*, the question before us was whether additional mail pay received in 1921 was taxable income for the year 1919. We held that it was not, relying upon the dictum contained in *Western Maryland Railway Co.*, *supra*. In *Gulf Mobile & Northern Railroad Co.*, *supra*, we held that additional mail pay received in 1920 was not taxable income of that year. We are of the opinion, upon the present record, that the back mail pay received by the petitioner in 1920, and accrued upon its books of account as income of that year, was taxable income of 1920. The opinion of the Board in *Gulf, Mobile & Northern Railroad Co.*, *supra*, is expressly overruled on the point here material.

### Issue (d)—Payment to Association of Railway Executives

It is stipulated and agreed that the facts as found by the Board in *Los Angeles & Salt Lake Railroad Co.*, 18 B. T. A. 168, shall be accepted as the facts in this proceeding, except as to the name of the petitioner and as to the amount in controversy, which amount is $871.84 paid by the Receiver in each of the years 1919 and 1920 to the Association of Railway Executives and disallowed by the Commissioner as a deduction from gross income in each of said years. In accordance with the decision of the Board in *Los Angeles & Salt Lake Railroad Co.*, *supra*, this issue is determined in the petitioner's favor.

### Issue (dd)—Taxability of Amount received under Section 209, Transportation Act, 1920

The petitioner maintains in this case, as have petitioners in other cases before the Board, that the amount received from the United States Government in settlement of the Government's guaranty under provisions of section 209 of the Transportation Act of 1920 does not constitute taxable income. The railroad received $1,881,085.23 in 1920. The respondent has determined that this sum constituted taxable income of the Receiver for 1920. This issue is determined in favor of the respondent. See *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233; *Missouri Pacific Railroad Co.*, 22 B. T. A. 267; and *Kansas City Southern Railway Co.*, 22 B. T. A. 949.

### Issue (j)—Material and Supplies

In the computation of the deficiency, the respondent has disallowed $546,322.60 of petitioner's maintenance expenses, by reason of the fact that the material and supplies account of petitioner at the

end of the Federal control period was $546,322.60 in excess of the amount which the Receiver paid for such material and supplies. The material and supplies account was carried upon the Receiver's books of account at the time he took over the same from the Director General of Railroads at $2,309,100.61. The actual cost to the Receiver of such material and supplies was $1,762,778.01, which amount is composed of $1,498,194.13, the book value and cost of material and supplies taken over by the Director General of Railroads from the Receiver at the beginning of the period of Federal control, and $264,583.88 paid by the Receiver to the Director General in settlement of balance of account upon final settlement in 1922. No question is raised by the petitioner that the book value of the material and supplies account at the time the Receiver took charge of the properties on March 1, 1920, was $546,322.60 in excess of the amount that he was required to pay for them.

In *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135, the facts were that material and supplies were returned to the petitioner after the period of Federal control which were equal in quality, quantity, and relative usefulness to material and supplies surrendered by the railroad at the beginning of Federal control. We held that the cost to the petitioner of such material and supplies received was the cost to it of those surrendered also that the deduction allowable as an expense when such material and supplies were expended is limited to such cost and is not necessarily the book value thereof when returned. The facts which obtain in the present proceeding are substantially the same as those which obtained in *Terminal Railroad Association of St. Louis, supra.*

The first contention made by the petitioner upon this point is that the Receiver did not know until long after the close of the year 1920 that he was not required to pay $2,309,100.61 for such material and supplies and that therefore there is no basis for the theory advanced by the respondent that any part of the maintenance expenses of 1920 should be disallowed by reason of the fact that the material and supplies were charged out to operating expenses in the last 10 months of 1920 at amounts in excess of the actual cost to the Receiver.

The facts are undisputed that the cost to the Receiver of the material and supplies in question was $546,322.60 less than their book value or cost of such supplies to the Director General of Railroads. As we have pointed out in numerous cases, *Terminal Railroad Association of St. Louis, supra; Chicago & North Western Railway Co.*, 22 B. T. A. 1407, a railroad company is not permitted to deduct from gross income maintenance expenses in excess of the amounts actually paid as such expenses. The Receiver kept his books of account upon the accrual basis. We think that it is immaterial

that the amount which was paid for the material and supplies taken over from the Director General of Railroads was not finally determined until 1922. To the extent that the material and supplies taken over from the Director General of Railroads were expensed in 1920, the Receiver is not entitled to deduct an amount in excess of the cost to the Receiver of such material and supplies expensed.

Material and supplies are carried in railroad accounts at amounts which represent as nearly as may be the cost of material and supplies on hand at any given date. As many items are carried in stock over a long period of time, the prices at which they are found do not necessarily represent current market prices at the time of the inventory. This is particularly true during a period of fluctuating prices. The theory underlying all accounting for material and supplies as far as railroads are concerned is that they shall be charged out at cost rather than at the present or market values. For this reason, when purchases are made the cost of new material is added from month to month to the cost of the old stock remaining on hand, and the disbursements thereafter are made on the basis of the resulting averages.

On the basis of the above facts, the petitioner contends that to the book costs of material and supplies on hand at March 1, 1920, the date they were taken over from the Director General, purchases during the balance of 1920 should be added and that the disbursements to operating expenses should be charged not at current market prices at March 1, 1920, but at prices which may be above or below those prices. The petitioner, therefore, has gone to great length to prove that the respondent is in error in disallowing the full amount of $546,322.60 as operating expenses on the ground that that amount represents the excess over cost to the material and supplies acquired from the Director General.

The contentions of the petitioner upon this point are shown by the following table, which it has painstakingly prepared:

*Recapitulation of excess charges to operating expense—1920*

| Item | On hand Feb. 29, 1920 | Receipts last ten months, 1920 | Total, column 2 and column 3 | Disbursements to operating expenses last ten months, 1920 |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 1. Cross ties | $492,887 | $764,609 | $1,257,496 | $646,725 |
| 2. Fuel oil | 45,063 | 3,934,540 | 3,979,603 | 2,895,617 |
| 3. Coal | 56,522 | 728,351 | 784,873 | 612,885 |
| 4. New steel rail | 5,316 | 36,775 | 42,091 | 35,928 |
| 5. Secondhand steel rail | 287,419 | 25,978 | 313,397 | 23,774 |
| 6. Scrap material | 33,725 | 282,114 | 315,839 | 278,292 |
| 7. General store stock | 1,366,145 | 2,016,155 | 3,382,300 | 1,455,823 |
| 8. Stationery | 21,969 | 154,221 | 176,190 | 122,559 |
| Total | 2,309,046 | 7,942,743 | 10,251,789 | 6,071,603 |

From an inspection of the above table it is to be noted that the disbursements to operating expenses during the last 10 months of 1920 with respect to seven of the eight classifications of material and supplies was in excess of the amount on hand on February 29, 1920. With respect to those classifications, the evidence does not show that the material expensed was not the material which was on hand on February 29, 1920. Therefore, as to such classifications we are of the opinion that the contentions of the respondent must be sustained. It is to be noted, however, that with respect to secondhand steel rail there was on hand February 29, 1920, steel rail of a book value of $287,419. The actual cost to the Receiver of such steel rail was $128,231 less than the book value. Of the secondhand steel rail there was disbursed to operating expenses during the last 10 months of 1920 only $23,774. It would therefore manifestly be error to find that maintenance expenses for the last 10 months of 1920 should be decreased to the extent of $128,231 representing the excess book value over cost of secondhand steel rail in respect of this item. The actual cost to the petitioner of the secondhand steel rail disbursed to operating expenses during the last 10 months of 1920 was only $15,223. Therefore, operating expenses in respect of this item should be reduced during the last 10 months of 1920 only in the amount of $8,551. We therefore find for the petitioner that the difference between $8,551 and $128,231, or $119,680, was erroneously disallowed as maintenance expenses for the 10-month period in question. In other words, the respondent was in error in disallowing maintenance expenses under this item to the full extent of $546,322.60. That amount should be reduced by $119,680, as above stated, and the disallowance of maintenance expenses for this period should be in the amount of only $426,642.60.

### *Issue (k)—Undermaintenance*

The Receiver in the lump-sum settlement, information in regard to which was first obtained from the Director General by the petitioner in 1927, was given credit for an amount of $126,271.38 entered by the Director General in said statement as undermaintenance. Neither the Receiver nor the petitioner has made in his or its books of account any entry to the effect that the Receiver was credited with any item of undermaintenance in the final settlement with the Director General.

In his determination of taxable income for the year 1920 the Commissioner disallowed $126,271.38 of the amount claimed as maintenance expenses in the corporation income and profits-tax return

filed by the Receiver for 1920. The petitioner contends that this disallowance of maintenance expenses for 1920 was in error; that if the petitioner is chargeable with income tax in respect of the $126,271.38 representing an allowance for undermaintenance it is chargeable to income tax upon that amount in 1922, when the amount was settled and received, and that the amount should not affect the deduction of operating expenses for 1920.

This is the same question which was before the Board in *Terminal Railroad Association of St. Louis, supra.* There we held, in effect, that, in the absence of a showing by the petitioner that the undermaintenance during the period of Federal control was not made good by charges to maintenance in 1920, the respondent must be sustained in disallowing a part of the maintenance expenses for 1920. Cf. *Kansas City Southern Railway Co.*, 22 B. T. A. 949.

The petitioner having failed to submit evidence that the undermaintenance during the period of Federal control was not made good by charges to maintenance during the last 10 months of 1920, the decision of the Board in *Terminal Railroad Association of St. Louis, supra*, is controlling in this case. In accordance therewith we sustain the action of the respondent in disallowing $126,271.38 of the maintenance expenses claimed as deductions in 1920.

*Issue (p)—Income earned by a Receiver*

The respondent asserts and the petitioner denies that the 1920 income of the Receiver (petitioner's transferor) can be subject to excess-profits tax imposed by Title III of the Revenue Act of 1918. It is stipulated that all the income in respect of which the taxes involved in this proceeding are to be assessed accrued to the Receiver as such; that the Receiver was appointed August 14, 1914, by United States District Court for the Southern District of Texas upon application and suit of creditors suing for debt and foreclosure of lien after default; that all of the properties and assets of International & Great Northern Railway Company, defendant in said suit, were taken into the custody and control of said court, and, except to the extent that they were taken over and operated by the President of the United States during 1918, 1919, and January and February, 1920, were controlled and operated by said court through its receivers until November 30, 1922, when after sale, made under the court's judgment of foreclosure and order of sale, and confirmed by the court, the said properties and assets were delivered to the petitioner as purchaser thereof. The portions of the Revenue Act of 1918 applicable to this issue are quoted below:

## TITLE II.—INCOME TAX.

### PART III.—CORPORATIONS.

SEC. 230. (a) That, in lieu of the taxes imposed by section 10 of the Revenue Act of 1916, as amended by the Revenue Act of 1917, and by section 4 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

\*     \*     \*     \*     \*     \*     \*

SEC. 239. That every corporation subject to taxation under this title \* \* \* shall make a return \* \* \*. In cases where receivers \* \* \* are operating the property or business of corporations, such receivers, \* \* \* shall make returns for such corporations in the same manner and form as corporations are required to make returns. Any tax due on the basis of such returns made by receivers, \* \* \* shall be collected in the same manner as if collected from the corporations of whose business or property they have custody and control.

\*     \*     \*     \*     \*     \*     \*

SEC. 240. (a) That corporations which are affiliated within the meaning of this section shall, \* \* \* make a consolidated return of net income and invested capital for the purposes of this title and Title III, and the taxes thereunder · shall be computed and determined upon the basis of such return: \* \* \*

## TITLE III.—WAR-PROFITS AND EXCESS-PROFITS TAX.

SEC. 301. (a) That in lieu of the tax imposed by Title II of the Revenue Act of 1917, but in addition to the other taxes imposed by this Act, there shall be levied, collected, and paid for the taxable year 1918 upon the net income of every corporation \* \* \*.

\*     \*     \*     \*     \*     \*     \*

SEC. 329. (a) That for the purpose of this title the net income of a corporation shall be ascertained and returned—

\*     \*     \*     \*     \*     \*     \*

(3) For the taxable year upon the same basis and in the same manner as provided for income tax purposes in Title II of this Act.

\*     \*     \*     \*     \*     \*     \*

SEC. 336. That every corporation, not exempt under section 304, shall make a return for the purposes of this title. Such returns shall be made, and the taxes imposed by this title shall be paid, at the same times and places, in the same manner, and subject to the same conditions, as is provided in the case of returns and payment of income tax by corporations for the purposes of Title II, and all the provisions of that title not inapplicable, including penalties, are hereby made applicable to the taxes imposed by this title.

In *Chas. Weisbecker, Inc.*, 3 B. T. A. 269, this Board sustained the contention of the respondent and held that the income of a receiver of a corporation under the provisions of the Revenue Act of 1918 was subject to excess-profits tax. Since then the Supreme Court has rendered its decision in *Reinecke* v. *Gardner*, 277 U. S. 239, and held that the net profits realized by a trustee in bankruptcy of a corporation from the operation of the corporation were not subject to excess-profits taxes provided for in section 206 (c) of the Revenue Act of 1917. In the course of its opinion the court stated:

As under the Bankruptcy Act (11 USCA) the entire property of the bankrupt vested in the trustee, the income in question was not the income of the bankrupt corporation but of the trustee, and was subject to income and excess profits tax only if the statutes authorized the assessment of the tax against him. * * *

The court further observed that although the receiver was made liable to the income tax, he was not specifically made liable to the excess-profits tax. The court stated:

The case is different with respect to the excess profits tax. That tax was imposed by title 2 of the Act of 1917 * * * on corporations, partnerships, and individuals engaged in trade or business. The title made no mention of executors, receivers, trustees or persons acting in a fiduciary capacity, and contained no language corresponding to the quoted provision of title 1, § 4, extending the additional income tax to "the same incomes" taxed by section 10 of the Act of 1916. A tax imposed on corporations alone does not extend to a trustee in bankruptcy of a corporation. * * *

The court further observed that "The extension of a tax by implication is not favored," citing *United States* v. *Whitridge*, 231 U. S. 144, and *Smietanka* v. *First Trust & Savings Bank*, 257 U. S. 602.

The respondent contends that even though a receiver is not subject to the excess-profits tax of 1917, the situation is materially changed by the Revenue Act of 1918. He argues, in the first place, that the Revenue Act of 1917 was an amendment of the income-tax portion of the Revenue Act of 1916 and was original legislation to the extent of the excess-profits tax portion, thereby, in effect, bringing into being two separate and distinct revenue acts; that, on the contrary, the Revenue Act of 1918 is one act which provides for income tax and excess-profits tax and must be read in its entirety. Secondly, that although Title II, Part III, of the Revenue Act of 1918, relates solely to the income tax provisions of the act as applied to corporations, it must be noted that section 239 requires receivers to make returns for the corporations whose properties they are operating, and that *any tax* due on the basis of such returns shall be collected as if from the corporations. Thirdly, that the plain intent to include the income of receivers in the class subject to income and excess-profits tax is apparent in section 240 (a), the income-tax section of the act, which requires consolidated returns of income and invested capital for the purposes of income tax and excess-profits tax.

We are of the opinion that the contentions of the respondent upon this point are without merit. The excess-profits tax is imposed by section 301 (a) of the Revenue Act of 1918. The tax is specifically imposed "upon the net income of every corporation." But the income of a receiver, as pointed out by the Supreme Court in *Reinecke* v. *Gardner*, *supra*, is not income of the corporation. If Congress had intended to impose the excess-profits tax upon others than cor-

porations, it would have done so by stating the specific taxable entities upon which the excess-profits tax should fall. It is a cardinal principle in the interpretation of taxing statutes that their language shall not be extended to include objects not clearly embraced therein. Such a rule was applied by the Supreme Court in *Reinecke* v. *Gardner, supra,* and we think that the principle invoked in that case is equally applicable with respect to the Revenue Act of 1918.

In *Smietanka* v. *First Trust & Savings Bank, supra,* the court stated, in holding that under the Income Tax Act of October 3, 1913, income accumulated for unascertained beneficiaries was not taxable:

No language in the act included a tax on income received by a trustee by him to be accumulated for unborn or unascertained beneficiaries. There was indicated in the taxing paragraph A the congressional intention to tax citizens everywhere, and noncitizens, resident in the United States, including persons, natural and corporate, on income from every source less allowed deductions. But nowhere were words used which can be stretched to include unborn beneficiaries for whom income may be accumulating. It may be that Congress had a general intention to tax all incomes whether for the benefit of persons living or unborn, but a general intention of this kind must be carried into language which can be reasonably construed to effect it. Otherwise the intention cannot be enforced by the courts. The provisions of such acts are not to be extended by implication. [Citing cases.]

Section 336 of the Revenue Act of 1918 requires:

That every corporation, not exempt under section 304, shall make a return for the purposes of this title. * * *

Having thus explicitly provided by whom returns shall be made " for the purposes of this title," section 336 enacts that " such returns " (that is, returns which it has just been declared " every corporation * * * shall make "—

* * * shall be made, and the taxes imposed by this title shall be paid, at the same times and places, and in the same manner, and subject to the same conditions, as is provided in the case of returns and payment of income tax by corporations for the purposes of Title II, and all the provisions of that title not inapplicable, including penalties, are hereby made applicable to the taxes imposed by this title.

Nowhere in Title III is there written any provision which " imposes the tax " on the income of a receiver, nor any provision which requires that a receiver " shall make a return for the purposes of this title." There is no specific or direct language in Title II which could not, without radical alteration of words and clauses, be carried over into Title III by way of incorporation therein by reference so as to impose excess-profits taxes on receivers.

Since the excess-profits tax is imposed only upon the income of corporations and since the income of a receiver of corporate property is not the income of a corporation, the Receiver of the International

& Great Northern Railway Company is not liable to excess-profits tax in respect of any income received in 1920.

*Issue (q) (3) and (4)—Increase of Invested Capital*

In view of our determination that the Receiver is not subject to excess-profits tax upon income of 1920, it is unnecessary to discuss these issues.

*Issue raised by Respondent—Interest on cost of Additions and Betterments*

Petitioner admits that the Receiver received from the Director General of Railroads in the final settlement effected April 14, 1922, $55,781.56 for interest upon the cost of additions and betterments, in accordance with the provisions of section 7 (d) of the standard contract. It is agreed that not until March 4, 1920, did the Director General determine the rate of interest he would employ in computing the amount of interest due to the Receiver, and that on or shortly after March 4, 1920, the Receiver was informed of such determination.

In his original claim filed with the Director General, the Receiver claimed $72,549.95 for interest on the cost of additions and betterments. The difference between the amounts so claimed and the amount paid by the Director General was due to computation at different rates of interest on the same amount of principal.

The Receiver did not accrue any amount as due to him from the Director General for interest upon the cost of additions and betterments and did not report any such interest in the income and profits-tax returns for the years 1918, 1919, and 1920.

Subsequent to March 4, 1920, the Director General computed such interest to be $12,231.58 for 1918, $35,881.84 for 1919, and $7,668.14 for the months of January and February, 1920, or a total of $55,781.56, which amount was paid to the Receiver in the final settlement effected April 14, 1922.

The respondent contends that since no basis of accrual for this interest existed prior to March 4, 1920, the interest allowed and paid by the Director General, computed at the rate of interest determined on March 4, 1920, constitutes taxable income of 1920.

This same issue has been before the Board in numerous proceedings, in all of which we have held that the amount so received should be separated and its component parts allocated to the years for which the interest was earned. *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279; *Kansas City*

748

*Southern Railway Co.*, 16 B. T. A. 665; *Missouri Pacific Railroad Co.*, 22 B. T. A. 267. The above cited decisions dispose of this issue.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

TRAMMELL, dissenting: I dissent as to the question of railway mail pay.